Argued and submitted October 7, 1980, modified October 20, 1981

# BURLINGTON NORTHERN, INC. et al,
*Appellants,*

*v.*

# DEPARTMENT OF REVENUE,
*Respondent.*

## (TC 1098, 1181, SC 26684)

635 P2d 347

Roger J. Crosby, Seattle, Washington, argued the cause for appellants. With him on the briefs were Steven L. Wood, Seattle, and Delbert W. Johnson, Portland.

Alfred B. Thomas, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief was James M. Brown, Attorney General, Salem.

PETERSON, J.

Tongue, J., specially concurring.

## PETERSON, J.

Burlington Northern operates a railroad in Oregon along the Columbia River between Portland and Astoria. Oregon Trunk Railway Company, a wholly-owned subsidiary of Burlington Northern, operates a railroad along the Deschutes River from the Columbia River into southern Oregon. Oregon Electric Railway Company, also a wholly-owned subsidiary of Burlington Northern, operates a railroad running through the Willamette Valley from Portland to Eugene. The primary issue before this court is the factual determination of the market value of these railroad operating properties for ad valorem tax purposes.

### 1. Burlington Northern and its operations

Burlington Northern, Inc., is a Delaware corporation doing business in the state of Oregon. It operates a multi-state railroad network in Oregon and 16 other states and two provinces of Canada. Oregon Trunk Railway is a Washington corporation with its principal place of business in Portland, Oregon. It operates as a common carrier by railroad in Washington and Oregon. Oregon Electric Railway Company is an Oregon corporation with its principal place of business in Portland.

In addition, Burlington Northern has substantial nonrailroad operations including a common carrier truck line; an air freight forwarding operation; a substantial natural resource business which includes the sale of timber and the manufacture and sale of other forest products; oil, gas, coal, taconite and other mineral operations; a small telephone company; and the development and management of industrial, agricultural, and commercial lands.

ORS 308.515(1)(a) requires that the Department of Revenue make an annual assessment of all railroad transportation property in the state of Oregon. Defendant did so. The plaintiffs were dissatisfied with the defendant's assessment, and filed proceedings in the Oregon Tax Court to contest the assessment.

### 2. The Tax Court trial and ruling

This case involves the valuation of the railroad operating properties covering years 1976 and 1977. By

appropriate orders, the Department of Revenue had determined the market value of the plaintiffs' properties as follows:

| | |
|---|---|
| 1976 | $42,085,201 |
| 1977 | 40,570,036 |

The plaintiffs filed complaints in the Tax Court alleging that the market value of the assessed properties was substantially less than the assessment of the Department of Revenue. Separate complaints were filed for each tax year, and the cases were consolidated for trial. At the commencement of trial, defendant said that it was abandoning its initial appraisal and would be seeking an increase in assessed valuation. After a lengthy trial before the Tax Court, the Tax Court issued its decision on February 14, 1979.[1] In its opinion, the Tax Court made no determination as to value, but indicated that of the three possible approaches to valuation of a railroad operating unit (Cost, Stock and Debt, and Income), "[t]he parties and the court agree that the income approach is the most useful of the three approaches in light of the facts developed by the testimony." 8 OTR at 59. The Tax Court also stated general agreement with the defendant's method of computation of the income to be considered, 8 OTR at 59, while disagreeing with defendant's computations in several specific respects. Therefore, the Tax Court, pursuant to its TC Rule 26,[2] withheld the entry of its decree pending a

---

[1] *Burlington Northern, et al v. Dept. of Rev.*, 8 OTR 19 (1979). The opinion of the Tax Court is nearly 60 pages in length, and contains an extensive summary of much of the relevant testimony. Therefore, much of the summary of the evidence which would normally be included in this opinion will not be included herein, and should the reader require further detail as to the evidence in this case, attention is invited to the opinion of the Tax Court.

[2] The written Tax Court opinion is characterized in the decision as a "split decision." This procedure stems from TC Rule 26 (which has since been amended and is now TC Rule 67), which then read as follows:

"After the court has entered its decision, it may withhold entry of its decree to permit the parties to submit computations pursuant to the court's determination of the issues. Forthwith, upon the entry of the decision, the parties shall attempt to agree on such computation. If the parties cannot agree on the amount of deficiency or overpayment or true cash value to be entered in the decree pursuant to the court's decision, each party shall serve and file a computation believed to be in accord with the court's decision. The court may require briefs or oral arguments before deciding on the proper computation."

recomputation by defendant in each of seven areas, following which the case would proceed, pursuant to TC Rule 26. 8 OTR at 75-76. After the defendant submitted its recomputations, a further hearing was held, following which the Tax Court ordered:

> "IT IS FURTHER ORDERED that defendant recompute its proposed computations filed in this court on March 21, 1979, by determining the January 1, 1976, and 1977 allocated Oregon values, based solely upon defendant's income approach to value (continuing to comply with the requirements numbered 1, 4, and 7, found on pages 83-85 [8 OTR at 76] of the court's decision of February 14, 1979), together with the distribution of such values in Oregon of the three plaintiffs in this suit, and thereupon to prepare a form of decree to be submitted to the court pursuant to the court's Rule 27."

The defendant filed revised Income approach calculations. Thereafter, the court entered a decree finding the true cash value of the plaintiffs' Oregon properties to be consistent with the defendant's final submission.

### 3. Valuation procedure in this court

As we stated in *Bend Millwork v. Dept. of Revenue,* 285 Or 577, 580, 592 P2d 986 (1979), in appeals from the Tax Court, this court performs two separate appellate functions. One is to try the case "anew upon the record." ORS 305.445 and ORS 19.125(3). In addition, the court sits as an "error correcting" court, in performing ordinary appellate functions of deciding whether the trial court committed an error of law. In this case we are largely involved with the former function, the fact-finding function of trying this case "anew upon the record" in order to determine the "true cash value" of the subject properties.

ORS 308.205 defines "true cash value" as "* * * market value as of the assessment date." The Department of Revenue's Rule OAR 150-308.205-(A)2 provides:

> "Methods and Procedures for Determining True Cash Value: Real property shall be valued through the market data approach, cost approach and income approach. Any one of the three approaches to value, or all of them, or a combination of approaches, may finally be used by the appraiser in making an estimate of market value, depending upon the circumstances."

It is permissible for the court (both the Tax Court and this court) to use one, more than one, or all these approaches in determining valuation of property. *Pacific Power & Light Co. v. Dept. of Rev.*, 286 Or 529, 533, 596 P2d 912 (1979).

### 4. The disputed issues

The parties are in general agreement as to several important matters. The plaintiffs and the defendant followed similar procedures in which they first attempted to determine the total market value of the railroad operating properties of Burlington Northern and the two subsidiaries here involved, and then apportion a percentage of the total value to Oregon. The parties made a diligent and generally successful effort to separate the operating railroad properties from the nonrail operating properties. All appraisers were initially close to agreement as to the capitalization rate to be applied under the Income approach. The main issue is whether defendant's Income approach valuation using an "annuity" technique, which was approved and adopted by the Tax Court, is appropriate to the valuation of plaintiffs' ongoing railroad operations.

The plaintiffs mainly relied upon the testimony of two experienced appraisers, John Green and Arlo Woolery. John Green testified that the Income approach was the most reliable approach; that neither Stock and Debt nor Cost were as reliable. His opinion of value of the total operating system was $750,000,000.[3] Mr. Woolery utilized all three approaches and concluded that the value of the total operating system was $760,000,000.

The defendant called an experienced appraiser, Richard Green, who agreed that the Stock and Debt approach was inappropriate. Giving the Cost approach a

---

[3] This case involves tax years 1976 and 1977. The decision as to tax year 1976 will largely determine all issues involved in tax year 1977 as well. Unless otherwise specified herein, all references are to evidence which concerns tax year 1976.

As stated earlier, all appraisers reached value judgments by first reaching a conclusion as to the plaintiffs' system-wide value, and then apportioning a value to the Oregon properties. In this opinion we will follow the same procedure, first determining the system-wide value and then determining the value of the Oregon property. For the most part, all references, unless otherwise specified, are to the value of the entire system.

weighting of 30 percent and the Income approach a weighting of 70 percent, Richard Green concluded that the total market value of the plaintiffs' Oregon operating properties was $59,960,000.

Following the "split decision" of the Tax Court, the defendant submitted revised computations which were further revised at the request of the Tax Court. The decree ultimately entered by the Tax Court determined the value of the Oregon properties to be:

| | |
|---|---|
| 1976 | $50,630,000 |
| 1977 | 50,254,000 |

It is apparent, both from the written opinion of the Tax Court and from comments made by the Tax Court at the final hearing,[4] that the Tax Court believed that the value determination should be made using the Income approach. We are inclined to agree that the Income approach is the more reliable approach to be used in this case, but we disagree that the "annuity" technique applied by the defendant's appraiser is appropriate in this case, and we disagree as to some important assumptions made in the defendant's appraisal.

For reference, we have prepared a table summarizing the opinions of the various expert witnesses and the court's findings relative to the determinations of value. (See page 736.)

---

[4] The Tax Court judge made this comment at the beginning of the final hearing, "* * * and it gives me a feeling that legitimately in this instance the income approach could be used solely with a truer result. * * * "

| figures are in (000) | | Oper/ Non-oper (in %) | and Debt | | | | Rate (In %) | | % | EN OE OT |
|---|---|---|---|---|---|---|---|---|---|---|
| John Green | 1976 | 50.62 49.38 | $767,250 | 1,368,000 | 54.38 | 678,250 | 10.5 | 750,000 / 21,195 | 2.826 | 59.9 17.96 22.14 |
| | 1977 | 49.57 50.43 | 834,700 | 1,404,000 | 55.34 | 760,000 | 10.75 | 80,000 / 22,232 | 2.779 | 59.99 21.6 |
| Arlo Wooley | 1976 | 55.55 44.45 | 714,000 | 822,000 | 75.18 | 755,000 | 11 | 760,000 / 20,596 | 2.71 | 56.3 27.09 16.61 |
| | 1977 | 47.23 52.77 | 650,000 | 761,000 | 78.86 | 773,000 | 11 | 770,000 / 20,944 | 2.72 | 58.42 25.16 16.42 |
| Richard Green | 1976 | 52.1 47.9 | 938,497 | 1,969,000 | — | 1,673,280 | 10.5 | 2,196,408 / 59,960 | 2.68 | 51.8 18.6 29.6 |
| | 1977 | 39.7 60.3 | 1,031,300 | 2,053,000 | — | 1,809,550 | 10.5 | 2,232,821 / 58,320 | 2.56 | 52 18.9 29.1 |
| R Green Revised Submission | 1976 | — | 938,497 | 1,801,177 | — | 1,616,400 | 10.5 | 1,895,894 / 51,832 | 2.68 | 51.8 18.6 29.6 |
| | 1977 | — | 1,031,300 | 1,840,349 | — | 1,757,200 | 11 | 1,938,469 / 50,708 | 2.56 | 52 18.9 29.6 |
| Tax Court and R. Green Final Submission | 1976 | — | | | — | — | 10.5 | 50,630 | 2.68 | 51.8 18.6 29.6 |
| | 1977 | — | | | — | — | 11 | 50,254 | 2.56 | 52 18.9 29.1 |

## 5. Theory of the Income Approach

All of the expert witnesses were agreed that the Income approach was a valid, reliable approach to the determination of value in this case. The witnesses were in strong disagreement, however, as to which variation of the Income approach was appropriate to the valuation of a going concern of this size and nature.

■ The Income approach to the valuation of property is a method of estimating the present worth of the benefits to be derived from the property in the future. The method involves a determination of the present and prospective income from the property, reduced to an indication of value by a mathematical process known as "capitalization." A rate known as the "capitalization rate" is applied to the estimated net annual income produced by the property to determine its value. For example, if the net annual income from a parcel of undeveloped land were $10,000, and a fair return on the investment is eight percent per annum, the indicated value of the property would be $125,000. The formula is expressed as

$$\text{Value} = \frac{\text{Income}}{\text{Rate.}}$$

The plaintiffs' appraisers calculated estimated net annual income after depreciation and taxes, applied the capitalization rate, and the result was their estimate of value under the Income approach. Their Income approach might be termed "direct capitalization" or "straight capitalization" or "capitalization in perpetuity" in the sense that these appraisers did not directly base their decision on the life expectancy of the plaintiffs' assets. The appraisal of the plaintiffs' expert John Green contains this analysis:

"The preceding pages reflects [sic] the net railway operating income for the year 1975 to be $53,766,000 for the year 1974 to be $71,258,000, for the year 1973 to be $44,649,000, for the year 1972 to be $44,630,000 and for the year 1971 to be $46,823,000. The unweighted average of the five year period was $52,225,000 with the weighted average being $54,926,000. The purpose of the Income Approach is to estimate the market value of a property based on the present capitalized value of future anticipated earnings.

"After a careful analysis of the past earnings, the present situation and future prospects of this railroad, I

have concluded that an informed buyer would anticipate that he could expect a net railroad operating income of $54,926,000, which when adjusted for the effects of leased equipment results in an anticipated income stream of $71,213,000. It is my opinion that such an investor, after considering the capital structure, cost of existing debt and a return on equity consistent with the risks involved, would require an overall return of 10.50% on this investment. Capitalization of the anticipated income stream of $71,213,000 at a 10.50% rate results in a value conclusion by the Income Approach of $678,250,000."

Mr. Woolery, the plaintiffs' other expert, pursued a similar course. He determined the probable future annual income from the railroad operating properties, selected a capitalization rate, and applied the formula set forth above.

The defendant's appraiser, Richard Green, was critical of the approaches pursued by the plaintiffs' appraisers. He was critical of their treatment of depreciation, of deferred taxes, and of the treatment of federal income tax expense, all of which will be discussed below.

6.  Discussion of the annuity technique
used by the defendant

The defendant pursued a theory of indirect capitalization under an annuity approach. Defendant's appraiser first determined the estimated annual income prior to depreciation to be $187,252,000. He then determined the average future life of the plaintiff's depreciable assets to be 19 years. He also determined the salvage value of such assets at the expiration of 19 years and the value of nondepreciable assets under a cost analysis. Using standard present value tables, and assuming a "discount rate" of 10 percent, he (1) ascertained the present value of the salvage and nondepreciable assets after the expiration of 19 years and (2) added to that the present value of annual payments of $187,252,000 over a 19-year term. Appended to this opinion as Appendix A and Appendix B are copies of Richard Green's submissions showing how he determined value under the Income approach.[5]

---

[5] Appendixes A and B were submitted at trial and are not the submissions made after the trial judge's request for such submissions. They well illustrate the defendant's valuation technique, however.

■    We reject the defendant's annuity approach. We do not believe that it comports with reality when viewing the facts of this case through the eyes of a reasonably prudent investor. The approach assumes, to a substantial degree (based upon the average remaining life of the depreciable assets), the noncontinuation of this business enterprise beyond 19 years. Burlington Northern and the subsidiaries involved in this case are regulated industries. They are required by law to provide reasonably adequate service, equipment and facilities. ORS 760.015. Federal law prohibits their discontinuation of rail service or the abandonment of all or portions of their lines absent governmental determination that such abandonment or discontinuance is in the public interest. 49 USC § 1(18). A prospective purchaser would be subject to these same regulatory requirements. We doubt that a purchaser would buy such an operating company assuming that operations could terminate at the conclusion of 19 years, which is implicit in the defendant's analysis.

In the defendant's brief, the defendant argues:

"Plaintiffs are wrong to suggest that a valuation method should make provision for replacement of plaintiffs' property. Future capital expenditures for additional property or expenditures to replace properties are not the subject of this case. * * * "

We cannot agree with that statement. The plaintiffs have an obligation, under the law, to continue operations, and the defendant's approach makes no provision for this requirement.

We also question whether the operating entity under the defendant's analysis could continue to generate an annual income flow of $187,252,000 for 19 years under the assumptions contained in the defendant's analysis. Operating equipment requires maintenance and repairs,

---

There is a dispute whether Richard Green was using the Hoskold "sinking fund" approach or the Inwood "annuity" approach. The Hoskold and Inwood methods appear to be similar, the main difference being that under the Hoskold method that portion of the annual payment attributable to amortization of the cost of the property is held in a sinking fund at a fixed rate of interest. Under the Inwood method the return on the investment and the recapture of the invested capital is included in the annual payment which the annuitant receives. *See* Friedman, Encyclopedia of Real Estate Appraising 45-47, 58 (Revised and Enlarged ed 1968). According to Friedman, *supra* at 58, the Inwood method generally achieves the highest indication of value.

and we are not convinced that the defendant's analysis makes adequate provision for maintenance and repairs of equipment which would be progressively deteriorating over a 19-year term. The defendant's valuation technique assumes a level income during the entire 19-year period, following which the property is liquidated and salvaged. We have serious reservations as to the assumption that the income stream would continue at a constant level, and we are persuaded that the annuity method of appraisal is more appropriate to wasting assets such as a mine or quarry or to long-term net leases of real property in which an income stream projection at a reasonably constant level is assured.

7.   Other aspects of the defendant's Income approach

A word of explanation is required regarding problems which arise incident to the treatment of depreciation in the valuation process. If depreciation is treated as an expense of doing business (and it usually is), the rate at which any given asset is depreciated will have an effect upon net income. Also, whether a given expenditure is treated as a depreciation expense may also have an effect on net income. For example, if the owner of a business has a piece of equipment that cost $10,000, which is depreciated over a 10-year life span, there will be a depreciation expense in each of the 10 years, chargeable against income, of $1,000. If, however, the owner depreciates the property over a period of five years, the depreciation expense for each of the five years will be $2,000. Under the former procedure, the net income of the business would be reduced by $1,000 per year for 10 years; under the latter approach, the net income of the business would be reduced by $2,000 per year over a five-year term. Thus, the rate of depreciation normally has a direct relationship to net income.[6]

Whether a given expenditure is treated as an expense of doing business, *i.e.*, expensed, or as a capital acquisition may also have an effect upon the net income of the business. For example, under appropriate ICC regulations, the plaintiffs charged as an expense of doing business all expenditures for such things as ties, rails, ballast,

---

[6] The example shown is "straight line" depreciation, one of several accepted methods of depreciation. *See* W. Andrews, Basic Federal Income Taxation 470-483 (1979).

track laying and surfacing, and other track material. The 1975 Burlington Northern annual report to the ICC shows that in 1975 it spent in excess of $19,600,000 for replacement of rails alone. The defendant's appraiser was critical of basing value under the Income approach on an accounting system in which such expenditures were "expensed" rather than "capitalized." In his appraisal report he stated:

"The reported net railway operating incomes prepared by railroads in accordance with the ICC Uniform System of Accounts provides an improper basis for estimating an income to be capitalized. The ICC requires railroads to use a retirement - replacement - betterment accounting system for track structure * * * and a depreciation accounting system for all other depreciable properties. Thus, in those years when a railroad implements an accelerating track rehabilitation program and the total amounts for such track structure replacements in kind are entered in expense accounts in the year of installation, reported net railway operating incomes decline. In the past several years rapidly rising material and labor prices for track structure caused by inflation have magnified this effect on net railway operating incomes. Capitalized income values developed from such declining net railway operating incomes would be declining while in reality the property value rises due to the rehabilitation and replacement program. * * *"

Green was also critical of the ICC-approved practice of permitting a railroad to accelerate depreciation for tax purposes, thus inflating expenses during the early stage of life of depreciating property. Green also criticized the ICC-approved practice of expensing the cost of acquisition of units of property having a value less than $1,500, and the ICC-approved practice of charging *all* federal income tax expense against rail transportation income. The evidence showed that approximately half of the net revenue of Burlington Northern between 1971 and 1976 arose from operations other than railroad operations.

Accordingly, Richard Green adjusted the "net income" figures upward over three-fold. Starting with a figure of $56,000,000 as the probable future average annual net railway operating income, he added $131,252,000 to that figure on the theory that depreciation charges in that amount had been improperly included as an expense of

operation. Green's conclusion was that the "total income to capitalize" was $187,252,000. Having determined the total income to capitalize, following the "annuity method" described above, he determined the market value under the income approach to be $1,673,280,000.[7] A substantial part

---

[7] Richard Green described his annuity approach as follows:

"It is generally known that net railway operating earnings of most railroads, as well as Burlington Northern's rail properties, appear to be inadequate when related to historical cost less depreciation data even after adjusting and restating the reported income statements. From a prospective purchaser's viewpoint these income statements must also be changed to obtain net incomes for appraisal use in estimating the anticipated future income stream that will provide the desired profit and return the purchase price over the remaining life of the existing property. To obtain the income to capitalize for this appraisal, certain dollar amounts identified as road property depreciation, equipment depreciation and track structure maintenance, i.e., replacement are added to the Probable Future Average Annual Net Operating Income as shown on Schedule E-4. [Green therefore added $131,252,000 to $56,000,000 with the conclusion that the "total income to capitalize" was $187,252,000.] Following the time-interest concept of money's worth, the future income stream anticipated over the remaining life of the existing rail property is converted to present worth including salvage as shown on line 29, Schedule E-4. The present worth factor of 8.3649 was selected from financial compound interest tables for a 10.0% annuity or capitalization rate. This 10.0% capitalization rate was developed from market data for representative rail oriented corporate security issues using the Band of Investment method.

"* * * * *.

"Thus, an estimated remaining life of 19 years, Schedule E-5 will be used in this appraisal as a reasonable approximation in lieu of an actual life study.

"Salvage value of the railroad properties at the end of their remaining life includes (1) land and nondepreciable grading at cost, (2) track and other Road property at a 5% of cost (residual value), and (3) equipment property at a 10% of cost (residual value) amounting to a total of $656,126,000 as shown at line 28 of Schedule E-4. Present Worth of this salvage or reversion value is obtained by applying a single payment factor obtained from 10.0% compound interest tables for a 19 year period as follows: $656,126,000 × 0.1635 = $107,280,000.

"The capitalized income value indicator was obtained by computing the present worth of anticipated total income to be derived from the rail transportation properties in the 19 year period. The total income to be capitalized includes an increment for expected return on capital (probable future average annual net railway operating income (herein called 'PFAANROI') and an increment for expected return of capital (adjusted depreciation). The PFAANROI was essentially based on a 5 year average of net railway operating incomes as shown on Schedule E-3. On Schedules E-1 and E-3 an adjustment was made to reported income data to assign a portion of Federal Income Tax expense accrued and deferred to Other Income (nonoperating income).

"* * * * *.

of Green's value determination turns on the correctness of his assumption that $131,252,000 was improperly expensed.[8]

Richard Green testified that although it may have been proper for the railroads to "expense" part of these sums under appropriate ICC regulations, in determining the value of property it was improper to treat all such expenses as a reduction from gross income. In his report he stated that the result of this was to decrease net railway operating incomes "* * * while in reality the property value rises due to the rehabilitation and replacement program." Green therefore increased the net income from $56,000,000 to $187,000,000. See Appendix A below.

There may well be a measure of truth to the statement that the property increased in value due to the repairs made. The record shows, for example, that the life expectancy of a railroad tie is 50 years. A roadway with new rails

---

"As shown on Schedule E-4, the total income to be capitalized is:

| | | |
|---|---|---|
| PFAANROI | $ 56,000,000 | |
| Depreciation: | | |
| Road Property except track structure | 18,216,000 | |
| Equipment | 47,534,000 | |
| Maintenance (track replacement) | 65,502,000 | |
| Total income to capitalize | $187,252,000 | |
| Present worth of total income is $187,252,000 × 8.3649 = | | $1,566,000,000 |
| Present Worth of Salvage residual value is $656,126,000 × 0.1635 = | | 107,280,000 |
| Thus, the capitalized income value indicator including salvage residual value as of January 1, 1976 is | | $1,673,280,000" |

[8] We note that the record shows that the defendant's original appraisal under the Income approach, made prior to the plaintiffs' appeal to the Tax Court, was on the theory of capitalizing income after depreciation, a method which has long been utilized by the Department of Revenue.

and ties would seem to be worth more than the roadway which was repaired.[9]

Normally, when dealing with assets having a useful life of more than one year, good business accounting and tax law require that the cost of the asset be spread out as an expense of operation over the years that the asset is used. Normally, the full cost of such assets is not expensed in the year of acquisition, but is capitalized and recovered through depreciation deductions. It is often difficult to decide whether expenditures relating to an asset should be treated as current expense or added to the balance sheet as an addition to capital. Federal tax law provides that repairs in the nature of replacements, to the extent that they arrest deterioration and effectively prolong the life of the asset, shall either be capitalized or be charged against the depreciation reserve account. *See* J. Mertens, Law of Federal Income Taxation § 25.41 (1981 Cumulative Supplement).

There can be no denying that if all such expenditures are consistently treated as an expense for accounting purposes, the net result would be to lower net operating income by the amount of such expenditures. On the other hand, there can be no denying that the result of this accounting procedure is to increase net operating income in later years during which charges would otherwise be made against gross income for depreciation of such assets. If the ICC-approved accounting practices are consistently followed, over a period of time, the "highs" and the "lows" would tend to even out.

This system of accounting was described by one witness as "retirement-replacement-betterment accounting" (RRB) as follows:

"A  Well, betterment accounting is — is where the — since it's dealing with the track, when the track is first constructed, the cost of the track is capitalized and when — no depreciation is taken. If some track is retired, it is removed from the asset account and charged to expenses. Likewise, if some account — part of the track was replaced,

---

[9] We should add that the record does not show the precise ways in which such expenditures were made; that is, whether entire sections of road were removed and replaced or whether bad ties or deteriorating rails were removed and replaced, as necessary.

it would be — the replacement would be charged to the expense account. The asset account would not be disturbed. The betterment feature of betterment-replacement accounting is — for example, if the original track was 100 pound weight that was capitalized and in a later year it was replaced with 132 pound rail, at the time of the replacement, 32 — the cost of 32 pounds would be capitalized and the cost of the 100 pounds of — deemed to be replacement would be charged to expenses."

Although the application of such accounting practices affects railroad net operating income, according to reports in evidence, the practice has long been recognized and accepted. A committee of the American Institute of Public Accountants studied the problem and recommended in 1957 that "* * * no substantial useful purpose would be served by a change to depreciation-accounting techniques in the absence of evidence indicating that depreciation-maintenance procedures would provide more appropriate charges to income for the use of such property." In 1966 a committee of the American Institute of Public Accountants reconsidered the matter and recommended "* * * that replacement accounting for ties, rails and other track materials of railroads under the jurisdiction of the Interstate Commerce Commission is a generally accepted accounting principle and is in conformity with generally accepted accounting principles."

One witness testified that in 1973 and 1974, the records of one railroad were reconstructed using both RRB accounting methods and "depreciation accounting" methods. The conclusion was that the net income of the carrier was not substantially changed under either method. As stated above, however, over a short period of time, particularly when substantial repairs and replacements to the roadway are made, the result would be to reduce net income.

The issue was recently considered by the Wisconsin courts in *Soo Line R. Co. v. Wis. Dept. of Rev.,* 89 Wis 2d 331, 278 NW2d 487 (1979); affirmed, *Soo Line R. Co. v. Wis. Dept. of Rev.,* 97 Wis 2d 56, 292 NW2d 869 (1980). The Wisconsin Court of Appeals held:

"* * * Where a taxpayer has consistently used a generally accepted method of accounting for legitimate business

purposes and not as a device the primary purpose of which is to avoid taxation, the Department of Revenue should accept the taxpayer's accounting method when making an ad valorem assessment of the taxpayer's property.

"The trial court found that Soo Line's treatment of rail and tie expense as a maintenance expenditure had the effect of understating both net railroad operating property and depreciation, and that to compensate for this it was necessary to add back rail and tie expenses to net railway operating income. This was error. Soo Line's accounting procedure for rails and ties accurately represents what occurs in fact: rails and ties are constantly wearing out and are constantly replaced. A willing buyer and seller would have no reason to change Soo Line's method of accounting for its rails and ties. There was no need to change Soo Line's accounting methods by adding back rail and tie expense. *Wisconsin Gas & Electric Co. v. Tax Comm.*, 221 Wis. 487, 503-504, 266 N.W. 186. This error necessitates a reversal of the judgment appealed from unless the Department of Revenue's assessment can be sustained through the use of a proper alternative method of appraising Soo Line's property." 278 NW2d at 495.

A similar issue was presented in *Pacific Power & Light v. Dept. of Rev.*, 286 Or 529, 561, 596 P2d 912 (1979). We there rejected an appraisal based upon the Hoskold method (see footnote 5). We cited with approval the "Report of Committee on Railroad and Utility Valuation," Western States Association of Tax Administrators (1971), at 15, in which it was stated:

"* * * So at least, in closely regulated companies there is possibly a persuasive argument that the book depreciation expense is a proper allowance rather than providing for depreciation in the capitalization rate."

■ We are not convinced that it was proper for the defendant's appraiser to so increase the estimated net income by over $130,000,000 per year. Such a method was rejected by the Wisconsin courts as a matter of law.[10] The defendant has failed to persuade us, in reviewing the

---

[10] In Wisconsin a more exacting appellate standard must be met, for appellate courts do not review *de novo*, as do we. In Wisconsin the appellate standard of review is whether the trial court's findings of fact are against the great weight and clear preponderance of the evidence and are clearly erroneous. Section 805.17(2), Stats.

evidence *de novo,* that RRB accounting should be rejected in this case.[11] We also note that the result of such RRB accounting may be to understate, possibly in a substantial way, the value of an operating concern, utilizing the Cost approach. For example, if a 50-year-old railroad line is replaced with new ties and new rail of the same type as previously existed, it would seem logical to conclude that the railroad line, as so repaired, is substantially more valuable than the railroad line as it existed prior to the repair. Moreover, the record in this case does not permit us to speculate as to the amount, if any, by which the improved condition of the plaintiffs' properties affects the fair market value of the properties under a Cost approach.

■    A related question is whether valuation under the Income approach should be determined before or after depreciation deductions have been made. Both of the plaintiffs' appraisers made their determination of value under the Income approach after depreciation. Under the facts of this case, we think that that approach is proper. An investor contemplating the purchase of these railroads would look at the after-tax, after-depreciation income to determine the anticipated net return. If the would-be buyer anticipated a net return of 10 percent, the buyer would likely make the calculations after depreciation and after payment of taxes.[12]

---

[11] The transcript shows that railroads report to their stockholders using depreciation accounting, but continue to report to the ICC under betterment accounting. Apparently no effort has been made in this case to determine what the fair market value of the plaintiffs' properties would be under depreciation accounting. The plaintiffs' experts used RRB accounting, and the defendant's expert treated all such expenditures as income. We do not embrace the defendant's treatment of the matter, and we lack the information to attempt to determine fair market value under depreciation accounting methods.

We do not hold that it would be improper for an appraiser to attempt to recast the balance sheet and operating statements of a railroad using depreciation accounting rather than RRB accounting. Nor do we mean to suggest that it would be improper for an appraiser to base an opinion as to market value upon an analysis where adjustment is made for accelerated depreciation.

Appendix C of this opinion illustrates the effect of accelerating depreciation. As stated in the text, Arlo Woolery adjusted for accelerated depreciation in determining value using the Income approach, which largely meets Richard Green's criticism on this point.

[12] All witnesses agreed that, if determination of value was made prior to depreciation, an appropriate adjustment must be made. This issue is discussed in an article by Alfred Ring in the Appraisal Journal, July, 1962, beginning at page

## 8.  Apportionment of Income Taxes

The defendant's appraiser was of the opinion that only income taxes attributable to railway income should be considered as an expense under the income theory. He made an apportionment of the income tax attributable to non-operating income and operating income.[13] The plaintiffs' appraisers, in preparing their calculations under the Income approach, determined net railroad operating income, after deducting for *all* federal income tax paid by the plaintiffs. All of the experts conceded that, in valuing the plaintiffs' properties, whether under the Cost, Stock and Debt or Income approach, the properties being valued should be limited to the operating properties owned by the plaintiffs, and that income from nonoperating properties and income from nonoperating companies owned by the plaintiffs should not be considered.

■    In determining the value of the operating railroad properties, income taxes attributable to nonoperating activities should not be offset against operating income of the railroad operating properties. Although the plaintiffs, under ICC accounting rules for determining net railway operating income, may well have been permitted to deduct all income tax, we believe that it is proper to allocate, when calculating value under the income approach, only that federal income tax expense attributable to rail operations.

## 9.  Deferred Income Taxes

The plaintiffs, for federal income tax purposes, used accelerated depreciation under tax laws which at various times have prescribed special rules for shorter periods of amortization than would be the case if the asset cost were depreciated over the normal life of equipment, with the result that deferral of income tax resulted.

---

325, entitled "Depreciation Expense vs. Depreciation Rate Method of Calculations." We are satisifed that, when appropriate adjustment is made, an identical result may obtain, whether value is calculated before or after depreciation. *Ring, supra,* The Appraisal Journal, July, 1962, at page 331.

[13] The defendant's appraiser, in his report, stated:

"Also, under ICC Uniform System of Accounts all Federal Income Tax Expense is charged against rail transportation income and none is charged against 'Other Income.' Other Income is chiefly 'Income From Nonoperating Property.' Here again, reported net railway operating incomes understate the income developed by the rail transportation properties. * * *"

Richard Green testified that the acceleration of depreciation reduced net earnings, skewing valuation under the Income approach toward lower net income and a proportionately lower market value. In some cases this may well be true, and we do not hold that it would be improper to recast balance sheets making appropriate adjustments for accelerated depreciation (see footnote 11). However, as will be seen below, Arlo Woolery, whose Income approach is adopted, made such adjustments, and we see no necessity to otherwise comment on the subject in this opinion.

10.   This court's determination of market value

Having rejected the annuity theory as a reliable approach to determining value in this case, we must look at the other evidence in the record to see if we can make a determination of value based upon such evidence. We have studied the record with this in mind and find that we can make a determination of market value so as to finally conclude this case.

All appraisers made value determinations under the Cost approach, the Income approach, and the Stock and Debt approach. The evidence that the Stock and Debt approach should weigh in our decision is not convincing and we reject that approach. The Tax Court and two of the three appraisers who testified believed that the Stock and Debt approach was of questionable reliability. *See* 8 OTR at 62, 63.

### The Cost Approach

The Cost approach is less reliable than would normally be the case because of the difficulty of determining the degree of functional and economic obsolescence. All witnesses agreed that, under the Cost approach, a deduction from net book value should be made for functional and economic obsolescence. John Green described obsolescence as follows:

"* * * But then the obsolescence category, two — two types: functional, and this would be problems within the property itself, such as improvement in the locomotives, improvement in the freight yards going to the larger capacity, the better hitches, the capacity to dump — totally dump the cars at — for coal or other type things. Improvements that have been made that are not reflected in

the current property. Functional problems within the property itself. Then economic obsolescence are losses in value or losses in income from factors outside the property itself. And with railroads, major problems there have been competition from the trucks. The railroads provide their own rights-of-way. Trucks are provided theirs. Subsidizing in some cases of some types of transportation. Barges are a big mover of traffic. They pay limited tax impact. Government intervention in wage disputes. Government control of operating characteristics. Government control of tariff rates. So many things outside of the property itself. But they have a negative effect on income and, as such, they are substantial and they are classified as economic obsolescence."

Arlo Woolery testified that the percentage of obsolescence was 75.18 percent. John Green stated that the percentage of obsolescence was 55.34 percent. The state's appraiser, Richard Green, made no specific deduction for obsolescence. His initial determination of market value resulted from weighting the Cost and Income approaches, using a 30 percent weight for the Cost approach and a 70 percent weight for the Income approach.[14] Richard Green's explanation of the calculation of obsolescence is unconvincing.

Many witnesses referred to an article by Lionel W. Thatcher and Richard C. Dubielzig entitled, "Obsolescence in Railroad Ad Valorem Tax Assessments," 1967 Wisconsin Commerce Reports 7-37. John Green's appraisal report includes this explanation:

It is my opinion that the most reliable method for estimating obsolescence in railroad property is to compare the subject railroad with the so-called 'super blue chip' factors. * * * This method compares various quality and efficiency factors of a representative group of railroads with the same factors for the subject railroad. The 'super blue chip' factors are used as a standard of measurement for comparison purposes. The comparison of the quality and efficiency factors will give a ratio which tends to measure the loss in income which is attributable to the

---

[14] Richard Green testified that he used "* * * a method shown on page 160 of the 1971 Western States Association of Tax Administrators Report on Railroad and Utility Valuation [Exhibit A] * * * to reflect functional and economic obsolescence * * *." His 70%/30% analysis does not appear to be consistent with that shown in the report.

subject railroad and which is brought about by its lack of efficiency. This method compares favorably with the normal method of estimating obsolescence by capitalizing loss in revenue arising from the deficiency. Lionel W. Thatcher and Richard C. Dubielzig in their study entitled 'Obsolescence in Railroad Ad Valorem Tax Assessments,' which was published by the University of Wisconsin, Bureau of Business Research and Service in May, 1967 used four 'blue chip' railroads. In this appraisal, I have used data compiled from a study of thirteen railroads. The average of the three highest values calculated for each quality and efficiency factor is used as a standard of measurement for comparison purposes. It is my opinion that the use of the larger number of railroads represents a much better comparison for measurement of the quality and efficiency of the Burlington Northern Inc. * * * "

Appendix D, below, sets forth the results of John Green's study. Green determined that the properties had a depreciated value of $2,645,707,000 which he reduced to $1,206,972,000 by application of an obsolescence factor of 54.38 percent. To this he added $160,726,000 for materials and supplies on hand, for a total value, under the Cost approach, of $1,367,698,000, which he rounded to $1,368,000,000.

John Green concluded that factors 1, 2, 7, and 8 of Appendix D should be given a double weight because those factors are the "most meaningful" in the sense that they more directly reflect the ability of the railroad to obtain a return upon investment. There can be no denying that factors 1, 7, and 8, in particular, directly reflect a return upon investment. At the same time, it is obvious that by giving these four factors an additional weight in the calculations, a higher obsolescence percentage results, for these four factors, when compared to the standard, show the greatest departure from the standard.

■ The factors listed in Appendix D reflect qualities of the plaintiffs' railroads other than obsolescence. These factors reflect, as well, such things as the quality of management, the skill of the work force, wages and salaries paid to labor and management, competition from other railroads, and a host of other influences which, apart from obsolescence, contribute to the plaintiffs' ability to compete in the market place. We believe that it is more realistic to

determine obsolescence in this case by giving no factor a greater weight than any other, with the result that the percentage of obsolescence for 1976 is 46.565 percent, and for 1977, 47 percent.

Under our analysis, the value using the Cost approach is as follows:

|  | 1976 | 1977 |
|---|---|---|
| Net investment | $2,645,707,000 | $2,744,117,000 |
| Less obsolescence |  |  |
| (46.565% and 47%) | 1,231,973,400 | 1,289,734,900 |
| System value | 1,413,733,600 | 1,454,382,100 |
| Add: Materials and |  |  |
| supplies | 160,726,000 | 178,196,000 |
| Total value under Cost |  |  |
| approach | 1,574,459,600 | 1,632,578,100 |

### The Income Approach

One of the exhibits, a report entitled "Appraisal of Railroad and Other Public Utility Property for Ad Valorem Tax Purposes," published in 1954 by the National Association of Tax Administrators, states at page 59:

"Having no precise way of measuring obsolescence, tax assessors must use extreme care when using cost as a value evidence. This is especially true in the field of railroad valuation, where in the case of some carriers the existence of considerable obsolescence is evidence. In such instances unless the assessor reduces his cost of reproduction figure by a percentage which in his judgment corresponds to the amount of obsolescence present his cost computations will be meaningless. Even where he does make such an adjustment, in cases where a large amount of obsolescence is known to exist good judgment would appear to require that cost be accorded considerably less weight in the final value determination than it is given in cases where little obsolescence is apparent."

All witnesses relied mainly on the Income approach. We were convinced, after reading the transcript, the exhibits, and the briefs, that the Income approach was by far the most reliable approach and have determined that a weighting of 70 percent should be given to the Income approach and 30 percent to the Cost approach.

The financial records of Burlington Northern, made independently of this case, tend to support the Income approach conclusions of John Green and Arlo Woolery. The table below, taken from reports to the shareholders and the appraisal reports of John Green, Arlo Woolery, and Richard Green, compares the net railroad operating income (NROI) as reported to the shareholders with the NROI as calculated by John Green, Arlo Woolery, and Richard Green.

| | NROI Per share- holder Reports | A. Woolery NROI | J. Green NROI | R. Green NROI[15] |
|------|---------------|---------------|---------------|---------------|
| 1976 | $73,000,000 | $68,689,000 | $61,283,000 | $64,799,000 |
| 1975 | 71,400,000 | 76,474,000 | 53,766,000 | 58,535,000 |
| 1974 | 92,900,000 | 97,305,000 | 71,258,000 | 78,108,000 |
| 1973 | N/Available | 71,890,000 | 44,649,000 | 43,911,000 |
| 1972 | N/Available | 75,544,000 | 44,630,000 | 49,360,000 |

Although the record is not as complete as we would like, it appears to us that the NROI as reported to the shareholders is significant because these reports were made using depreciation accounting and thus represent, to some degree, the NROI calculated upon other than a RBB basis. It would seem that these reports would tend to minimize the disparities referred to by Mr. Richard Green. See page 741. To some extent, the preparers of the reports would be trying to impress the shareholders with the record of the company and thus there would be little desire to understate NROI in the reports.

---

[15] The Richard Green figures are after adjustment for deferred federal taxes, accelerated depreciation, and other miscellaneous adjustments. Mr. Green's figures for NROI, prior to such adjustments were:

| 1976 | $61,283,000 |
|------|-------------|
| 1975 | 53,766,000 |
| 1974 | 71,258,000 |
| 1973 | 43,205,000 |
| 1972 | 48,033,000 |

It should be understood that all of the Richard Green NROI figures are calculated before the addition of over $131,000,000 on the theory that that amount had been improperly "expensed" and should have been capitalized. See text at pages 741-742.

We further note that the conclusions of John Green and Richard Green are very close. There is nothing to indicate that either John Green or Arlo Woolery were playing fast and loose with the financial records in making their value judgments under the Income approach.

Arlo Woolery's determination of value under the Income approach meets many of the objections raised by Richard Green, for Mr. Woolery made adjustments for accelerated depreciation, investment tax credits and losses on passenger service. However, he made no adjustment for the fact that all income tax was charged as an expense to railroad operations.

■ Having rejected the defendant's annuity technique to Income approach valuation, and having rejected its addition of $131,000,000 to net income as discussed above, we will adopt the Income approach analysis of Mr. Woolery. Woolery concluded that the anticipated annual net railway operating income for 1976 was $83,000,000; for 1977, $85,000,000. To the Woolery figures we add $3,356,500 and $5,692,000 as income tax attributable to nonrail operations for 1976 and 1977 (which figures we obtained from the stockholder reports). The total net income to be capitalized is as follows:

|  | 1976 | 1977 |
|---|---|---|
| Projected annual NROI | $ 83,000,000 | $ 85,000,000 |
| Add income tax attributable to nonoperating income | 3,356,500 | 5,692,000 |
| Total income to be capitalized | $ 86,356,000 | $ 90,692,000 |

There being little dispute as to the proper capitalization rate under analyses using this approach (see table on page 736, *supra*), we find, as did the Tax Court, that an appropriate capitalization rate for 1976 is 10.5 percent, and

for 1977, 11 percent. Our conclusion as to the market value of the plaintiffs' properties under the Income approach is:

| | |
|---|---|
| 1976 | $822,438,090 |
| 1977 | 824,472,720 |

## CONCLUSION

Our conclusions of true cash value of the subject property are as follows:

| | 1976 | 1977 |
|---|---:|---:|
| Value per Cost approach (30%) | $ 472,337,880 | $ 489,773,430 |
| Value per Income approach (70%) | 575,706,660 | 577,130,900 |
| Total system value | 1,048,044,540 | 1,066,904,330 |
| Oregon percentage[16] | 2.68% | 2.56% |
| Oregon value for ad valorem tax purposes | 28,087,592 | 27,312,750 |
| Burlington Northern TCV (51.8%/52%) | 14,549,372 | 14,202,630 |
| Oregon Trunk TCV (18.6%/18.9%) | 5,224,293 | 5,162,110 |
| Oregon Electric TCV (29.6%/29.1%)[17] | 8,313,927 | 7,948,010 |

Modified. Costs to neither party.

---

[16] We adopt the Oregon percentages suggested by the defendant.

[17] We adopt the percentages as found by the Tax Court.

APPENDIX A

Burlington Northern Inc
Present Value; Multiplier Compared With Divisor     RVG 9/14/7
12/31/75

CAPITALIZED INCOME VALUE (In thousands of dollars)

Present Value                    187,252 × 8.3649* = 1,566,000    (Rounded)
  Add: PW of Salvage Residual    656,126 × 0.1635* = 107,000     (Rounded)
  Total Present Value                               1,673,000

or,

Cap Inc Prior to Depreciation         $\dfrac{187,252}{0.11955*}$ = 1,566,000   (Rounded)

Add: PW of Salvage Residual   656,126 × 0.1635* = 107,000   (Rounded)
  Total Present Value                             1,673,000

This approach may be broken down to show a
depreciation or recovery of capital factor
as follows:

$\dfrac{PFAANOI + Depreciation}{Interest Rate + Depreciation Factor}$ = $\dfrac{56,000 + 131,252}{0.10000 + 0.01955*}$ =

                             = $\dfrac{187,252}{0.11955*}$ = 1,566,000   (Rounded)

Add: PW of Salvage Residual   656,126 × 0.1635* = 107,000   (Rounded)
  Total Present Value                             1,673,000

*Factor selected from financial compound interest
 tables for a 10.0 % discount rate and 19 year life.

## APPENDIX. B

### CAPITALIZATION OF INCOME
(Amounts in Thousands)

| Year | Unrecovered Balance at Year End | Return On Inv. | Return Of Inv. | Total | Present Worth Factor | Present Worth Amount |
|---|---|---|---|---|---|---|
| 0 | $1,673,280 | -- | -- | -- | -- | --- |
| 1 | 1,653,356 | $ 167,328 | $ 19,924 | $ 187,252 | .909091 | $170,229 |
| 2 | 1,631,440 | 165,336 | 21,916 | " | .826446 | 154,754 |
| 3 | 1,607,332 | 163,144 | 24,108 | " | .751315 | 140,685 |
| 4 | 1,580,813 | 160,733 | 26,519 | " | .683013 | 127,896 |
| 5 | 1,551,642 | 158,081 | 29,171 | " | .620921 | 116,269 |
| 6 | 1,519,554 | 155,164 | 32,088 | " | .564474 | 105,699 |
| 7 | 1,484,257 | 151,955 | 35,297 | " | .513158 | 96,090 |
| 8 | 1,445,431 | 148,426 | 38,826 | " | .466507 | 87,354 |
| 9 | 1,402,722 | 144,543 | 42,709 | " | .424098 | 79,413 |
| 10 | 1,355,742 | 140,272 | 46,980 | " | .385543 | 72,194 |
| 11 | 1,304,064 | 135,574 | 51,678 | " | .350494 | 65,631 |
| 12 | 1,247,218 | 130,406 | 56,846 | " | .318631 | 59,664 |
| 13 | 1,184,688 | 124,722 | 62,530 | " | .289664 | 54,240 |
| 14 | 1,115,905 | 118,469 | 68,783 | " | .263331 | 49,309 |
| 15 | 1,040,243 | 111,590 | 75,662 | " | .239392 | 44,827 |
| 16 | 957,015 | 104,024 | 83,228 | " | .217629 | 40,751 |
| 17 | 865,464 | 95,701 | 91,551 | " | .197845 | 37,047 |
| 18 | 764,758 | 86,546 | 100,706 | " | .179859 | 33,679 |
| 19 | 653,982 | 76,476 | 110,776 | " | .163508 | 30,617 |
|  |  | $2,538,490 | $1,019,298 | $3,557,788 | 8.364919 | $1,566,000* |
| 19 | Reversion & Salvage |  | 653,982 |  |  | 107,280* |
|  | Total |  | $1,673,280 |  |  | $1,673,280 |

\* Rounded

        Column 1 - Number of years of remaining economic life.
        Column 2 - The unrecovered balance of investment herein de-
                   clining each year because of recovery of capital
                   (column 4).
        Column 3 - Return on investment. 10 percent of column 1 (re-
                   ceived at end of year).
        Column 4 - Return of investment. Column 3 subtracted from
                   column 5, the projected cash flow (income stream).
        Column 5 - The cash flow (income stream) to be received each
                   year (average annual amount).
        Column 6 - Present worth factor.
        Column 7 - Column 5 x column 6.

## APPENDIX C

### EXAMPLE
### COMPARISON OF STRAIGHT-LINE/SUM-OF-YEARS DIGITS/
### DOUBLE DECLINING BALANCE DEPRECIATION METHODS

ASSUMPTIONS:
  Railroad locomotives - cost $1,000,000
  Depreciation - 25 years

| YEAR | STRAIGHT-LINE | SUM-OF-YEARS DIGITS | DOUBLE DECLINING BALANCE |
|------|---------------|---------------------|--------------------------|
| 1  | $40,000 | $76,923 | $80,000 |
| 2  | 40,000  | 73,846  | 73,600 |
| 3  | 40,000  | 70,769  | 67,712 |
| 4  | 40,000  | 67,692  | 62,295 |
| 5  | 40,000  | 64,615  | 57,311 |
| 6  | 40,000  | 61,538  | 52,727 |
| 7  | 40,000  | 58,461  | 48,508 |
| 8  | 40,000  | 55,384  | 44,628 |
| 9  | 40,000  | 52,307  | 41,058 |
| 10 | 40,000  | 49,230  | 37,773 |
| 11 | 40,000  | 46,153  | 34,751 |
| 12 | 40,000  | 43,076  | 31,971 |
| 13 | 40,000  | 39,999  | 29,413 |
| 14 | 40,000  | 36,922  | 27,060 |
| 15 | 40,000  | 33,845  | 24,895 |
| 16 | 40,000  | 30,768  | 22,904 |
| 17 | 40,000  | 27,691  | 21,072 |
| 18 | 40,000  | 24,614  | 19,386 |
| 19 | 40,000  | 21,537  | 17,835 |
| 20 | 40,000  | 18,460  | 16,408 |
| 21 | 40,000  | 15,383  | 15,095 |
| 22 | 40,000  | 12,306  | 13,888 |
| 23 | 40,000  | 9,229   | 12,777 |
| 24 | 40,000  | 6,152   | 11,755 |
| 25 | 40,000  | 3,100   | 10,814 |

APPENDIX D

## BURLINGTON NORTHERN INC.

## COST APPROACH AT 12-31-75

I.  Net Investment in Railroad Property Used in Transportation Service Adjusted for Obsolescence Using Comparison of Operating Characteristics of Burlington Northern System as Compared to Standard or "Super Blue Chip" Factors:

| Factor Number | Operating Characteristic | Burlington Northern | Standard | % Burlington Northern to Standard |
|---|---|---|---|---|
| 1 | Rate of Return | 2.21% | 7.59% | 29.12% |
| 2 | Freight Traffic Density (Thousands) | 3,298 | 9,473 | 34.81% |
| 3 | Load Factor | 2,059 | 2,462 | 83.63% |
| 4 | Transportation Performance | 95,084 | 124,649 | 76.28% |
| 5 | Operating Ratio | 19.26% | 32.00% | 60.19% |
| 6 | Transporation Ratio | 59.94% | 68.58% | 87.40% |
| 7 | Gross Profit Margin Before I.T. | 4.27% | 20.48% | 20.85% |
| 8 | Gross Revenue Per Mile of Road | $ 58,165 | $165,238 | 35.20% |

Average of Factors for Burlington Northern (Weight of 2 to Factors 1, 2, 7 & 8)        45.62%

Indicated Percent Obsolescence for Burlington Northern (100.00% - 45.62%)        54.38%

(Thousands)

II.  Net Investment in Railroad Property Used in Transportation Service    $    2,438,838
Add: Net Book Value of Operating Property Leased from Others        220,959
Total Property Used in Transportation Service    $    2,659,797
Less: Depr. Investment in Licensed Vehicles        14,090
Property Used in Transportation Service Less Licensed Vehicles    $    2,645,707
Less: Obsolescence (54.38%)        1,438,735
Indicated System Value of Property Used in Transporation Service by Cost Approach    $    1,206,972
Add: Materials and Supplies        160,726
Indicated Value of Operating Property    $    1,367,698

Say    $    1,368,000

**TONGUE, J.,** specially concurring.

I concur in the opinion by the majority, but wish to make it clear that by my concurrence I do not acquiesce in the long delay of over 10 months after oral argument in the preparation of a proposed opinion for submission to this court for approval, not to speak of the delay of 12 months after oral argument in the final decision of this case.

At the recent annual meeting of the Oregon State Bar, Chief Justice Denecke, in his annual report as Chief Justice, stated that all members of this court are "concerned" about the length of the period between oral argument of cases in this court and the decision of such cases. He did not, however, offer any hope of reducing this period of delay, much less any program or proposals to accomplish that purpose.

I have previously protested similar long delays in the preparation by members of this court of proposed opinions for consideration by the court. *See State v. Classen,* 285 Or 221, 238, 590 P2d 1198 (1979); *Haynes v. Burks,* 290 Or 75, 91, 619 P2d 632 (1980); *State v. Quinn,* 290 Or 383, 407, 623 P2d 630 (1981); *Sterling v. Cupp,* 290 Or 611, 633, 625 P2d 123 (1981); and *Ore-Ida Foods, Inc. v. Indian Head Cattle Co.,* 290 Or 909, 923, 627 P2d 469 (1981). Despite these protests, the average period of time from oral argument of cases to their decision by this court has increased during the past year. As of August 31, 1980, the average time from oral argument to decision was 97 days. As of December 31, 1980, that period of delay had increased to 113 days. As of April 30, 1981, it had increased further to 124 days, and as of August 31, 1981 (the latest available statistics), this average period of delay had increased further to 128 days.

The American Bar Association, in its "Standards Relating to Appellate Courts" prepared by its Commission on Standards of Judicial Administration in 1977, called for an average of 60 days from oral argument to decision, with a maximum of 90 days, except for cases of "extraordinary complexity."[1] Indeed, a more recent report by the ABA

---

[1] This may be a case of "extraordinary complexity." That fact does not, in my opinion, justify a delay of over 10 months in the preparation of the proposed opinion in this case for submission to the court for approval.

Action Commission to Reduce Court Costs and Delay appears to regard a delay of 30 days by appellate courts in deciding cases as excessive and recommends, among other things, that decisions by appellate courts be made within 7 days of oral arguments in cases deemed suitable for "expedited handling," i.e., single issue or "straightforward" appeals. *(The Judges' Journal,* Spring 1981, Vol. 20, No. 2, pp. 50, 54. See also p. 59.)

In other words, at a time when responsible advocates of reform in judicial administration call upon appellate courts to substantially reduce the period of delay between oral argument and the decision of cases, this court has permitted that period of delay to substantially increase to an average of more than twice even the 1977 ABA Standards for Appellate Courts, to say nothing of the reform called for by the more recent ABA Commission.

This would not be good, according to ABA standards, even for an appellate court under a heavy caseload and one required to hear all appeals. It is far worse for an appellate court such as this, which is a court of review and which, by declining review, can control its caseload.[2] Delays for an average of 128 days after oral argument by such a court in deciding cases in a "second layer" of appeals become particularly intolerable when added to the time required for the Court of Appeals to previously hear and decide such cases and the time required to process petitions for review in such cases.

The principal cause for this increase in delay in the decision of cases, in my opinion, is the failure of members of this court to prepare proposed opinions for consideration by this court within 90 days of oral argument. (See discussion in *Ore-Ida Foods, Inc. v. Indian Head Cattle Co., supra,* at 923.) I have previously suggested that for the purpose of preparing proposed opinions in cases assigned to them, appellate judges should be subject to the same rule

---

[2] As noted in the concurring opinion in *State v. Quinn,* 290 Or 383, 623 P2d 630 (1981), since this court became a full court of review, the average number of opinions per "regular" member of this court has steadily declined from an average of 41 for the year 1976 to 17.6 for the year 1980.

which required trial judges to file "certificates of compliance" as a condition of payment of their monthly salaries to the effect that they have no cases "under advisement or undecided" for more than 90 days unless prevented by sickness or unavoidable casualty, or the time is extended by stipulation in writing (ORS 1.050). *See State v. Classen, supra,* 242, n. 10; and *State v. Quinn, supra,* at 416. A request was then made for an opinion by the Attorney General of the State of Oregon whether ORS 1.050 was a valid statute.

In response to that request, the Attorney General issued an opinion to the effect that ORS 1.050 is unconstitutional, in part upon the ground that the statute gave no consideration to the problem of a judge assigned a case of great difficulty. In so ruling, the Attorney General undertook to distinguish the decision of this court in *Nendel v. Myers,* 162 Or 661, 94 P2d 680 (1939), in which this court held that the legislature could properly require trial judges to rule on motions for new trials within 55 days, as a statute "enacted to expedite court business." The Attorney General suggested, however, that "* * * The Supreme Court may have power, by rule, to impose such a limitation upon the trial judges of the state * * *." (1981 A.G. Op. No. 8006, March 5, 1981, p. 9.)

It is of interest to note that since that opinion by the Attorney General, and despite the fact that this court has said that "we are not bound" by such opinions *(Alexander v. Gladden,* 205 Or 375, 383, 288 P2d 219 (1955)), this court has not considered either the validity of that opinion or the suggestion that such a requirement be adopted by court rule for either trial judges or appellate judges. ORS 1.050 has not been repealed by the legislature. Trial judges have been informed by the Court Administrator, however, that they need no longer file such "certificates of compliance."

As a result, trial judges are now free to take more than 90 days to decide cases and other matters submitted to them for decision for the first time since the adoption of what is now ORS 1.050, presumably to stop such abuses by some trial judges. In my view, this has been a further "step

backwards" by this court on the vital subject of delays in litigation on which the public is extremely critical of the courts. (See *State v. Quinn, supra,* at 417, referring to a survey of public attitude toward courts by the National Center for State Courts.)

It may be that a rigid "90-day or no pay" rule for appellate judges would be unreasonable and that some "flexibility" should be allowed for preparation of proposed opinions by appellate judges who are assigned cases of "extreme complexity" (cf. ABA Standard for Appellate Courts). In my view, however, it would be both reasonable and practicable for this court to adopt a "90-day or no pay" rule for both trial judges and appellate judges, subject to the qualification that the period of 90 days may be extended by the Chief Justice upon a showing of good cause in writing in cases of "extreme complexity." At the least, in my opinion, this court should face up to the problem of what I believe to be an excessive period of delay between oral argument and the decision of cases by this court, and take some positive action, by court rule or otherwise, in an affirmative effort to alleviate this problem.

Expressions of "concern" about the problem by members of this court and its Chief Justice are futile unless transformed into a program for affirmative action. As stated in *State v. Quinn, supra,* at 419, if members of the court have the *will* to do so, they can find a way to accomplish that purpose, just as this court, beginning in 1957, overcame a similar problem of delays on appeals, under the leadership of a strong Chief Justice.

Indeed, the recent decision by this court in the "legislative reapportionment case" *(McCall v. Legislative Assembly,* and related cases) decided September 24, 1981, after oral argument on September 14, 1981, is proof that even in a case involving problems as difficult and complex as those presented in that case, a well-reasoned and somewhat lengthy opinion, with two specially concurring opinions, could be prepared by members of this court within 10 days after oral argument, and well within the time limit of October 1, 1981, as mandated by Article IV, Section 6(2)(c)

of the Oregon Constitution, when the members of this court are required to do so.[3]

---

[3] There is no reason to believe that in the absence of that constitutional requirement the period of time between oral argument and decision of these cases would not have been as long as in other cases of comparable or even less difficulty during the past year beginning September 1, 1980, and which were not decided for more than six months after oral argument. *See, e.g., The Kashmir Corporation v. Patterson,* 289 Or 589, 616 P2d 468 (1980), *Blanton v. Union Pacific Railroad Co.,* 289 Or 617, 616 P2d 477 (1980); *City of Klamath Falls v. Winters,* 289 Or 757, 619 P2d 217 (1980); *State v. Knowles,* 289 Or 813, 618 P2d 1245 (1980); *State v. Tourtillott,* 289 Or 845, 618 P2d 423 (1980); *Stevenson v. State of Oregon,* 290 Or 3, 619 P2d 247 (1980); *Hall v. State,* 290 Or 19, 619 P2d 256 (1980); *State ex rel Young v. Crookham,* 290 Or 61, 618 P2d 1268 (1980); *Frasure v. Agripac,* 290 Or 99, 619 P2d 274 (1980); *State v. Bruno,* 290 Or 159, 619 P2d 648 (1980); *State v. Odam,* 290 Or 160, 619 P2d 647 (1980); *Springfield Education Assn. v. School Dist.,* 290 Or 217, 621 P2d 547 (1980); *James v. SAIF,* 290 Or 343, 624 P2d 565 (1981); *Castro v. SAIF,* 290 Or 353, 624 P2d 564 (1981); *Maddox v. SAIF,* 290 Or 357, 624 P2d 570 (1981); *Mitchell v. SAIF,* 290 Or 361, 624 P2d 571 (1981); *Paresi v. SAIF,* 290 Or 365, 624 P2d 572 (1981); *Sterling v. Cupp,* 290 Or 611, 625 P2d 123 (1981); *Smith v. Smith,* 290 Or 675, 626 P2d 342 (1981); *Wash. Squ. v. First Lady Beauty Salons,* 290 Or 753, 625 P2d 1311 (1981); *Ore-Ida Foods v. Indian Head,* 290 Or 909, 627 P2d 469 (1981); *Smith v. Pernoll,* 291 Or 67, 628 P2d 729 (1981); *Mehrer v. INA Life Ins.,* 291 Or 115, 628 P2d 397 (1981); *State v. Curran,* 291 Or 119, 628 P2d 1198 (1981); *State v. Shumway,* 291 Or 153, 630 P2d 796 (1981); *U.S. National Bank v. Fought,* 291 Or 201, 630 P2d 337 (1981); *State v. Clark,* 291 Or 231, 630 P2d 810 (1981); *State v. Edmonson,* 291 Or 251, 630 P2d 822 (1981); *State v. Blocker,* 291 Or 255, 630 P2d 824 (1981); *State v. Ogle,* 291 Or 364, 630 P2d 865 (1981); *U.S. Nat'l Bank v. Homeland,* 291 Or 374, 631 P2d 761 (1981); *Grable v. Weyerhaeuser Company,* 291 Or 387, 631 P2d 768 (1981); *Hitchcock v. McMinnville City Council,* 291 Or 404, 631 P2d 777 (1981); *Fed. of Seafood Hrvstrs v. Fish & Wildlife Comm.,* 291 Or 452, 632 P2d 777 (1981).