# IN THE OREGON TAX COURT

## SOUTHERN PACIFIC TRANSPORTATION COMPANY
v.
## DEPARTMENT OF REVENUE
(TC 1093, 1189, 1282, 1362)

George L. Kirklin, Spears, Lubersky, Campbell & Bledsoe, Portland, represented plaintiff.

Alfred B. Thomas and Elizabeth S. Stockdale, Assistant

Attorneys General, Department of Justice, Salem, represented defendant.

Decision for plaintiff rendered February 22, 1982.

**CARLISLE B. ROBERTS, Judge.**

Pursuant to ORS 308.505 et seq. (relating to the assessment of designated utilities and railway companies by the Department of Revenue), the Utility Section of the Assessment and Appraisal Division, Oregon Department of Revenue, assessed the true cash value of the real and personal property of the Southern Pacific Transportation Company's Oregon railroad transportation property as of January 1, 1976 (Tax Court No. 1093), January 1, 1977 (Tax Court No. 1189), January 1, 1978 (Tax Court No. 1282) and January 1, 1979 (Tax Court No. 1362). The plaintiff appealed these assessments to this court, pursuant to ORS 308.620 (1975 Replacement Part) and ORS 305.560, seeking to reduce the assessments in each year. The cases were consolidated for trial purposes.

The Southern Pacific Transportation Company (SPT) is a Delaware corporation and a wholly owned subsidiary of Southern Pacific Company, a holding company. SPT is engaged in the business of furnishing railroad transportation in the states of Oregon, California, Nevada, Utah, Arizona, New Mexico, Texas and Louisiana. It is a Class I railroad and a common carrier, subject to the Interstate Commerce Act, 49 USCA § 1(1)(a), and, as such, is obligated to furnish railroad transportation upon reasonable request therefor (49 USCA § 1(4)); to construct, maintain and operate switch connections with railroad branch lines or private sidetracks (49 USCA § 1(9)); to furnish safe and adequate car service (49 USCA § 1(11)); and to obey strictly and conform promptly to orders and directions of the Interstate Commerce Commission (49 USCA § 1(17)(a)).

SPT is primarily an originator and a terminator of traffic, more than 90 percent of its traffic being of this nature. Such traffic necessarily and extensively involves SPT terminal and switching activities which are, by their nature, relatively unprofitable. The main lines of SPT run (1) along a north-south axis from Portland, at the northern terminus, to

Southern California; (2) along an east-west route between San Francisco and Ogden, Utah (connecting there with the Union Pacific and other carriers); and (3) along an east-west route running from Los Angeles and connecting with such other lines as the Rock Island (in New Mexico) and the St. Louis & Southwestern Railroad (SSW, also known as the "Cottonbelt") at Corsicana, Texas, and Shreveport, Louisiana.

The SSW is a Class I railroad, owning and operating a railroad transportation line within the states of Illinois, Missouri, Arkansas, Louisiana and Texas. The SSW functions primarily as a "bridge" or intermediate carrier for other carriers along transcontinental routes, more than 50 percent of its traffic being of this character. In other respects, the SSW serves primarily the agricultural and forest products industries of Arkansas and small portions of Louisiana and northeastern Texas. Although the operations of SSW are much smaller in scope than those of SPT, the nature of its activity makes it a much more profitable operation.

Prior to 1930, the SSW was owned and controlled independently of SPT but the two companies entered into an agreement to provide a coordinated service between their two lines. This was advantageous to SPT, affording that company better access to an important gateway to the east (St. Louis) and it was advantageous to SSW in supplying additional intermediate or overland traffic to that line. SPT acquired stock control of SSW early in the 1950s and by 1978 its ownership had risen to 99.71 percent. There is a great deal of overlapping of directors and top executives between SPT and SSW.

The first question to be determined in this suit is whether SSW should be regarded as a part of the "unit" for purposes of property taxation in Oregon, as provided by ORS 308.555.[1]

---

[1] The Department of Revenue consolidated the SPT and SSW appraisals, beginning with the 1972 Oregon assessment. In the spring of 1976, a tax commissioner of SPT, in conference with the Utility Section of the Department of Revenue, suggested that several smaller lines in California, feeders to and owned by SPT, should be included in the unit, as follows: Northwestern Pacific Railroad Company, Petaluma and Santa Rosa Railroad Company, San Diego and Arizona Eastern Railway Company, Holton Inter-Urban Railway Company and Visalia Electric Railroad Company. The Department of Revenue accepted the suggestion, although these small lines were operating at a loss. (Tr 521.) The inclusion of these small lines in the unit appears reasonable and has not been contested in these suits.

Mr. Richard V. Green, an appraisal engineer in the Utility Section of the Assessment and Appraisal Division, Oregon Department of Revenue, was defendant's chief witness and the author of its appraisal reports. He testified to the inclusion of SSW with SPT, beginning with the 1972 assessment. (Nothing has been shown to this court that SPT protested this consolidation prior to filing its appeal for the 1976 tax year.) On the face of the record, it appears that Mr. Green relied chiefly on an ICC Order, Finance Docket No. 25723, dated October 28, 1969, involving the formation of the Southern Pacific Company as a holding company (owning 100 percent of the stock of SPT, which in turn acquired control of SSW in the early 1950s (Pl Br, at 21)). Mr. Green quoted from the ICC Order: " 'The fact that Transportation Company and its subsidiaries will constitute a single integrated railroad system cannot be disputed.' " (Def Ex A, at 7.) There was no testimony establishing a foundation for this conclusion. Mr. Green also testified, however, that the inclusion of the SSW in the appraisal unit was rendered more complex than was desirable because SPT's ICC Annual Reports do not include certain rail transportation properties (mostly small "feeder lines") as part of the operating rail transportation system, notably SSW.

The plaintiff cited many reasons why the SSW should not be included in the unit:

(1) SSW maintains its own books, payroll, inventory, and the like.

(2) SSW's financial statements are separately audited, apart from SPT, by the Southern Pacific's outside auditors.

(3) The Interstate Commerce Commission reports of SPT and SSW are filed separately, in accordance with the requirements of ICC.

(4) Under requirements of ICC, SSW's tariffs are separately maintained.

(5) Under the rules of the Security and Exchange Commission, SSW's 10-K statements are separately filed.

(6) SSW issues separate annual reports to shareholders and conducts its own shareholder meetings.

(7)    SSW solicits traffic separately from SPT and competes with it for freight traffic, utilizing traffic agents and advertising for that purpose.

(8)    SSW handles its own long-term debt and equipment trust obligations and these are rated separately by rating agencies (and have always been given a higher rating than those of SPT, a benefit which would be lost on merger). These obligations are purchased by different investors.

(9)    SSW handles its own cash flow separately from SPT, with separate lock boxes, bank accounts and use of its own checks and invests liquid funds separately (although subject to Southern Pacific Co.'s policies for security and liquidity).

(10)    SSW has its own purchasing manager, its own equipment budgets (which are determined separately from SPT), it orders its equipment in its own name (and there is no cross-financing). Each company negotiates its own equipment leases, makes its necessary line repairs, and issues separate American Association of Railroads (AAR) billings on repairs for each other as well as other carriers.

(11)    SSW operates under the Uniform Code of Operating Rules for railroads and SPT operates under its own, different code. The two use different weights of rail and the engineering design of switches differs between the two (because of different methods of operation).

(12)    The two railroads use separate crews to operate trains and use separate and different retirement programs. Transfer of employees from one company to the other carries loss of seniority under union rules.

(13)    SSW is regarded by state authorities as separate from SPT in each state in which it operates (including Louisiana and Texas where both SPT and SSW have lines). Apart from individuals who serve as officers or directors of both companies and apart from top management functions in San Francisco, the testimony shows that SSW operates as separately from SPT as it does from any foreign railroad.

(14)    The evidence shows that purchasers of bonds and equipment certificates and other evidence of indebtedness

in the market treat SSW and SPT as separate organizations and take note of SSW's better market rating.

In the consideration of this issue, the arbiter must always hold in mind that the purpose of these suits is to find the basis in Oregon property for the imposition of Oregon ad valorem taxation. This is to be carefully distinguished from an income tax case, under ORS chapters 317 and 318, where an auditor seeks to ascertain the net income of foreign corporations which is properly ascribable to Oregon for tax purposes. This determination is relatively simple in some instances, but not when the taxpayer's resources in two or more states are necessary in order to make a profit from the sale of a particular product and when the profit must be allocated to more than one state for income tax purposes. In the income tax law, a well-established formula provides for the determination of income, measured by the three factors: property, payroll and sales. The allocation of income between Oregon and other states is based upon ascertaining a multiplier, developed from the three factors.

■ In the property taxation of railroads, however, we are seeking to find the true cash value of only that real and personal property and some intangible values which have a situs in Oregon. We must first establish a unit of operating property, part of which is in Oregon and the elements of which are economically indivisible for the railroad's operating purposes. The out-of-state property's operation must be closely related to the operation of like property in Oregon. For example, in a railroad operation, if a train collision or high water or rail failure in another state would adversely affect the use of the Oregon track facilities in the regular course of business, all the directly affected area should be deemed a part of the Oregon property unit for the initial, total valuation (with subsequent allocation to Oregon of a certain amount of the value, pursuant to ORS 308.550 and 308.570).

The court concludes that, for the reasons given by plaintiff set out above, supported by the testimony of numerous highly experienced and knowledgeable witnesses, the preponderance of the testimony supports the plaintiff's contention, and the court finds that SSW should be excluded from the unit during the assessment years before the court.[2]

---

[2] In addition to the reasons set out by the plaintiff, the court suggests that the

The plaintiff seeks to overturn the values determined by the Department of Revenue for the Oregon property of SPT and assessed by the department as of January 1, 1976, 1977, 1978 and 1979. The department's witness, Mr. Richard V. Green, testified and presented appraisal reports for each of the years involved.

Mr. Green is a man of probity and has had substantial professional experience in a limited area.[3] Mr. Roger C. Maude, a long-time employee of the Oregon Department of Revenue (20 years) and, since April 1, 1979, Supervisor of the Utility Section therein, was responsible for a study of the cost of capital to determine the proper interest rate (the "cap rate") for the assessment years 1976 through 1979 involved in these suits. The rates determined by him were used by Mr. Green without further research.

ORS 305.427 provides that in all proceedings before the Tax Court, a preponderance of the evidence shall suffice to sustain the burden of proof (which falls upon the party seeking affirmative relief). The initial burden is upon the plaintiff in these suits but the court deems it helpful first to review the appraisal work of Mr. Green, enabling the reader hereof to weigh the prima facie case which the plaintiff must overcome if it is to succeed.

■ Mr. Green gave careful consideration to each of the approaches to value customarily used in railroad and utility cases: Cost, Stock and Debt (used in lieu of the Market Data Approach, inasmuch as no sales of railroads could be found) and the Income Approach. He found values under each of these approaches for each year but he determined that neither

---

remoteness of SSW from Oregon activity must be noted, the connection being made in Louisiana and Texas with SPT. It appears to the court that the east-west connection of San Francisco to Ogden, Utah, must be of predominant value in serving and enhancing the Oregon property.

[3] Richard V. Green received his Bachelor of Science degree in Engineering (with a major in Industrial Manufacturing and Management) from Oregon State University in 1955. He has kept himself up to date over the years by participation in courses and workshops sponsored by colleges and appraisal institutes. Over the years 1961 to 1980, he has made annual market value appraisals of the Oregon properties of six major interstate railroads, 15 smaller railroads, 31 large and small water transportation companies and an air express company. Prior to 1961, he annually made market value appraisals of the Oregon properties of five large interstate telephone companies, 39 smaller telephone companies and the interstate telegraph company.

the Cost nor the Stock and Debt valuation indicators had sufficient validity to be given weight in these proceedings. (Def Ex A, at 21-23.)

Mr. Green's consideration of the Income Approach is set out in Defendant's Exhibit A, at 10-18, supported by attached schedules. His opening paragraph (at 10) reads:

> "For a typical income producing rail transportation system such as the SP Consolidated Railroad operates, the income to capitalize should be within the appraisal context of an anticipated average annual income stream to be received *over the remaining life of the existing rail transportation properties.* This is the total income stream a prospective purchaser would reasonably expect annually to provide a return on his purchase price as well as a return of that purchase price." (Emphasis supplied.)

This statement is acceptable to the parties but there is a basic difference in their contentions as to the determination of "the remaining life of the existing rail transportation properties."

Mr. Green, viewing the *precise* property in place on the assessment date, January 1, 1976, asserts that it is obvious that the rail properties do have a limited life. "* * * It is folly to make a perpetual life income estimate when the available data indicates [sic] that the SP Consolidated rail properties have a remaining life of 20 years as developed on Schedule E-4. * * *"[4] (Def Ex A, at 10.) He pointed out (Def Ex A, at 11) that the reported net railway operating income (NROI), as prepared by railroads in accordance with the ICC Uniform System of Accounts, "provides an improper basis for estimating an income to be capitalized. The ICC requires railroads to use a retirement-replacement-betterment [RRB] accounting system for track structure * * * and a depreciation accounting system for all other depreciable properties." He takes note that there is evidence to show that the track "replacement" costs entered in the ICC accounts are equivalent to depreciation but concludes (Def Ex A, at 13) that, to obtain income before depreciation for the track structure as well as all other properties, it is necessary to estimate an amount of the

---

[4] Plaintiff contends that an investor in railroad securities deems a perpetual life to be the norm. The defendant formerly accepted this theory.

railroad's annual track maintenance or replacement cost (RRB) that is equivalent to depreciation.

Mr. Green regarded as a particular weakness in the RRB accounting system the fact that a railroad, at will, can accelerate a track rehabilitation program in particular years, thus skewing the income stream and the capitalized income values developed from the declining net railway operating incomes. This will lead to a reduced value for such years, under the income approach, while in reality the property value has been increased due to the rehabilitation and replacement program. And he pointed out that several other ICC accounting rules also tend to cause incomes to be understated, giving examples. (Def Ex A, at 13-15.)

Apparently to avoid the problems described above, in using the income approach, Mr. Green developed his *net* income before deducting for depreciation and interest expenses.

He pointed out that, under the ICC Uniform System of Accounts, all federal income tax expense of a railroad is charged against the rail transportation and nothing against "other income." "Other income" is chiefly from nonoperating properties. Inasmuch as Oregon is centrally assessing only the operating property, Mr. Green made an allocation between federal income taxes allocable to the two kinds of property and allowed as a deduction only those attributable to the operating property. (*See* Def Ex A, B, C, D, Schedule E-5.)

He also made provision "so that the income approach will exclude working cash and thereby reflect the same physical properties as the other valuation indicators," and testified that "working cash has been estimated [as] amounting to 1—12 of operating expenses less depreciation and taxes. A return on working cash to deduct from anticipated income has then been computed at the appropriate interest rate as shown on Schedule E-1 and carried forward to appear as a deduction at line 30, Schedule E-5." (Def Ex A, at 15.)

He included in the income to be capitalized for these appraisals certain dollar amounts identified as road property depreciation, equipment depreciation and track structure maintenance (which he deemed to be "replacement equivalent to depreciation") and added these items to the probable future

average annual net operating income, shown on Schedule E-3 in Defendant's Exhibits A, B, C and D.

The remaining life of the rail properties was determined to be 20 years (see data developed in Exhibit A, Schedule E-4). The 20-year life was deemed to be a reasonable approximation in lieu of an actual life study. A present worth factor of 7.834873 was selected from financial compound interest tables, based upon an 11.25 percent cap rate and a remaining life of 20 years in which to recover the capital invested and to pay a reasonable profit thereon. (This 11.25 percent rate was developed by Mr. Green's colleague, Mr. Roger Maude, Supervisor of the Utility Section, and was developed from market data for representative rail-oriented corporate security issues, using the band-of-investment method. The probable future average annual net railway operating income was based on a five-year average of net railway operating incomes as shown on Schedule E-5 found in the four appraisal reports.)

Mr. Green also found that the residual value of the railroad properties at the end of their remaining 20-year life includes (1) land and nondepreciable grading at cost, (2) track and other road property at five percent of cost (residual value), and (3) equipment property at a 10 percent of cost (residual value), a total of $325,579,000 as shown on line 29 of Schedule E-3. "* * * Present worth of this salvage or reversion value is obtained by applying a single payment factor obtained from 11.25 percent compound interest tables for a 20-year period as follows: $325,579,000 × 0.118577 = $38,600,000." (Def Ex A, at 17.)

Mr. Green found a probable future average annual net railway operating income, as of January 1, 1976, of $78,653,000 to which he added "depreciation" of road property except for the track structure, equipment, dismantling and retirement costs and maintenance (track replacement) of $67,200,000 for a total income to be capitalized of $242,960,000. Multiplying this present worth of total income by the factor, 7.834873, he obtained a total of $1,903,600,000 to which he added the present worth of the salvage residual ($325,579,000 × 0.118577) of $38,600,000 to obtain the capitalized income value indicator including salvage, $1,942,200,000, under the income approach.

In his correlation, Mr. Green stated:

"To this value must be added the true cash value of rail freight equipment leased from various private parties including Southern Pacific Equipment Co. This value additive was developed as shown on Schedule LP-1 [in Def Ex A] by finding the present worth of annualized lease expenses reported for this equipment and adding the amount of $312,935,000 at line 17, column 8, of the Summary Worksheet.

"Then true cash value deductions for the Company's rail equipment leased to others and for licensed vehicles were made by application of a 'K' factor to the depreciated cost of this equipment. The 'K' factor is a ratio of TCV − Depreciated Cost, i.e., $1.942 billion − $2.437 billion = .80. Thus, values of .80 × $83,655,000 = $66,924,000 for rail equipment leased to others and .80 × $6,298,000 = $5,038,000 for licensed vehicles were deducted as shown at lines 18 and 19, column 8, of the Summary Worksheet.

"After making these deductions, the SP Consolidated Rail Transportation System true cash value, of properties owned and used, to allocate is: $2,183,173,000." (Def Ex A, at 23-24.)

Mr. Green used an allocation factor of 7.90 percent in allocating the Oregon value from the system true cash value given above. He explained (Def Ex A, at 25) the factor of 7.90 percent as an average of the past three years' allocation factors developed by utilizing the NATA formula (Def Ex E) with certain modifications found on Defendant's Exhibit A, Schedule A-1. To the Oregon allocation figure, there has been added the sum of $4,146,000, representing ICC Account 510, rental income, three-year average, $487,000 × 7.8350 PWF equals $4,146,000, reflecting the value of certain rights-of-way and station grounds located in Oregon, the income from which was separately reported but should be added to Oregon value, for a grand total of $176,646,000.

The same methods were employed for the assessments for 1977, 1978 and 1979 assessment years and the allocated true cash values of the properties on the assessment date for the respective years are shown in Defendant's Exhibit B, at 26, for 1977, as $182,013,000; in Defendant's Exhibit C, at 25, for January 1, 1978, as $187,919,000; and in Defendant's Exhibit D, at 26, as of January 1, 1979, as $244,078,000.

In preparation of its appraisal reports for the present

suits, the defendant had been guided by the decision of this court in the case of *Burlington Northern et al v. Dept. of Rev.*, 8 OTR 19 (1979). This matter was appealed to the Oregon Supreme Court, which published its decision in *Burlington Northern v. Dept. of Rev.*, 291 Or 729, 635 P2d 347 (1981), substantially modifying the decision of the Oregon Tax Court. This decision was handed down after the present suits were submitted to this court but must be followed in this opinion.

In the *Burlington Northern* suit, in the Tax Court, the defendant's appraiser, Richard V. Green, determined that the stock and debt approach was inappropriate and gave the cost approach a weighting of 30 percent and the income approach a weighting of 70 percent. On the basis of the evidence adduced in that suit, the Tax Court was convinced that, in the light of all of the testimony, the income approach should be used solely. The Oregon Supreme Court (Peterson, J., speaking for the court) stated (291 Or 729, 735):

> "* * * We are inclined to agree that the Income approach is the more reliable approach to be used in this case, but we disagree that the 'annuity' technique applied by the defendant's appraiser is appropriate in this case, * * *."

In the present suits, the same witness, Mr. Green, relied completely upon the income approach but also made use of the "annuity technique," which the court must now reject.

As a part of the annuity technique, Mr. Green determined the average future life of the plaintiff's depreciable assets to be 19 years and determined a salvage value of the assets at the expiration of that time. This technique, also used in the present suits, was rejected in the *Burlington Northern* case by the Supreme Court (291 Or 729, 739):

> "We reject the defendant's annuity approach. We do not believe that it comports with reality when viewing the facts of this case through the eyes of a reasonably prudent investor. The approach assumes, to a substantial degree (based upon the average remaining life of the depreciable assets), the noncontinuation of this business enterprise beyond 19 years. Burlington Northern and the subsidiaries involved in this case are regulated industries. They are required by law to provide reasonably adequate service, equipment and facilities. ORS 760.015. Federal law prohibits their discontinuation of rail service or the abandonment of all or portions of their lines absent governmental determination that such abandonment or discontinuance is in the public interest. 49 USC 1(18). A

prospective purchaser would be subject to these same regulatory requirements. * * *"

This finding is applicable to defendant's appraisal in the present suits.

In these suits, as in the *Burlington Northern* case, "The plaintiffs have an obligation, under the law, to continue operations, and the defendant's approach makes no provision for this requirement." (291 Or 729, 739.)

In *Burlington Northern,* the Oregon Supreme Court also held that the railroad system of accounting, required by the Interstate Commerce Commission, described as "retirement-replacement-betterment accounting" (RRB) shall be accepted; that the determination of value of the Income approach shall be made *after* taking the deduction for depreciation; that plaintiffs' total federal income taxes shall be allocated between operating and nonoperating properties and deduction shall be taken only for the federal income tax attributable to the railroad operations of the unit which is subject to valuation herein; that the income approach being deemed the most reliable of the three approaches, the weight of 70 percent should be given to the income approach and 30 percent to the cost approach, under the facts of the *Burlington Northern* case. (299 Or 729, 755.)

These determinations of the Oregon Supreme Court, following submission of the Southern Pacific Transportation suits to the Tax Court, substantially affect the weight to be given to defendant's testimony in the present suits.

The principal witness on behalf of the Southern Pacific Transportation Company was Doctor Arthur A. Schoenwald of Colonia, New Jersey. Doctor Schoenwald is exceptionally qualified as an expert witness in railroad valuation for property tax purposes.[5]

---

[5] Doctor Schoenwald was graduated from Baruch School of Business of The City College of New York, B.B.A., cum laude 1961; Graduate School of Business, University of Chicago, M.B.A. 1962; Graduate School of Business Administration, Harvard University, D.B.A. 1968. In each school, he concentrated in accounting, economics and finance. Between July 1967 and July 1972, he taught at the Graduate School of Business Administration, Rutgers University, the State University of New Jersey, teaching financial management and investment analysis and served as an expert witness on questions of cost of capital and fair rate of return before utility boards. In 1972, he became Executive Director of the Public Utilities Commission of the State of

Doctor Schoenwald gave careful consideration to each of the three typical approaches to value used in railroad valuation cases: the cost approach, the stock and debt approach and the income approach. He rejected the cost approach (*see* Pl Ex 1, at 50-60). He pointed out that cost evidence (essentially original cost of railroad property used in transportation service less depreciation and obsolescence on such original cost) rarely evidences actual market value. "As discussed herein, the measure of obsolescence is difficult at best. However, any cost-based estimate of value for railroad property without an attempt to recognize obsolescence is grossly misleading and more seriously deficient." (Pl Ex 1, at 50, n 1.)

The Tax Court recognizes the difficulties of the cost approach and its typical failure to carry conviction to the trier of fact in these cases.

However, Doctor Schoenwald does attribute some value to the stock and debt approach. He testified (Tr 140):

"With respect to the stock and debt approach, we focus on market price — market price of securities — in the belief that when we sum up properly the security values and other proper obligations, we end up with the market's estimate of the value of all of the company's assets. This measure starts with gross value. These are essentially security prices. Now this is a strength, because security prices are a measure of market price and that is part of our objective, market price. Unlike the cost [cost approach], which had three or four irrelevant numbers in coming to a result, at least we know that this is relevant. It may not be perfect, but none of our indicators of value are the answer to value. They are typically termed indicators of value. So, despite what might be strengths and weaknesses, we have to recognize that we get an indication of value and not the answer. * * *"

He candidly recognized the weaknesses of the approach. On cross-examination, he said (Tr 257-258):

"* * * I'm saying there are problems with the [stock and debt] approach and I recognize those problems and I attempt

New Jersey. He served briefly as Manager of the Electric Utilities group at Salomon Brothers, New York City, and, since October 1975, has been engaged as an independent financial consultant, testifying in many railroad valuation cases. (*See* Pl Ex 1, at 66-67.)

to determine what I believe the biases in the method might be, but the reason I like the approach is that most of the data is provided by the marketplace and therefore I don't have to depend on the estimates and judgments inherent in the income approach. In other words, I cannot control the data in the stock and debt approach in any possible way. The key problem is making a realistic elimination of the nontaxable assets. But the market data on my securities and on many of my properties is readily determinable."

He recognized that the property in this proceeding is not the property which is the subject of sale under the stock and debt approach but concludes that the investor typically looks at the underlying property in making his estimates of what he can expect from his securities. (Tr 259.) In his appraisal report, Plaintiff's Exhibit 1, 44-49, Doctor Schoenwald discusses many weaknesses of the "stock and debt market price approach."

In Table 6 (Pl Ex 1), in each of the Appendices A, B, C and D, the witness set out the steps which he followed in obtaining the system value by this approach for the assessment years 1979, 1978, 1977 and 1976, respectively.

The valuation of railroad funded debt, equipment obligations "other securities" and leased equipment was determined on the basis of average data for the single calendar year next preceding the assessment year, based upon analyses and submissions of the Southern Pacific Transportation Company to the Oregon Department of Revenue. Each security and other obligation included its related current maturities. Equipment obligations reflected capitalized lease obligations per the annual report to stockholders of the year preceding the year of assessment. "* * *Leased equipment represents those additional obligations which do not satisfy the criteria for being capitalized on the books in accordance with Interstate Commerce Commission procedures and generally accepted accounting principles; per Company analysis." (Pl Ex 1, App A, Table 6, at 80.)

Current liabilities (net) and other liabilities reflected the year-end levels per the annual report to the stockholders for the year preceding the assessment year, less the current portion of long-term debt, less the consolidated balances attributable to the St. Louis Southwestern Railway Company

(SSW) and less the current and long-term amounts of capitalized leases included in equipment obligations. Common stock value of the Southern Pacific Company, including the Southern Pacific Transportation Company, was determined after deducting the stock value attributable to SSW, based on its contribution to SPT's earnings. The problem of separating the nonrailroad and nonoperating property was through the "direct method," "which attempts to identify their values through independent, individual means." (Pl Ex 1, at 46.)

> "* * * In some cases, book values of assets are unquestionably their worth. Consequently, such values were used for current assets and other relatively-liquid investments. In other cases, book values are totally inappropriate for the reasons discussed in Schedule V (Cost Approach). However, market values do exist for certain assets, such as securities, and were employed in eliminating non-railroad and non-operating property. Another measure of market value was available from property value assessments, which allowed further meaningful deductions from gross value." (Pl Ex 1, at 48.)

Using this approach, Doctor Schoenwald obtained system values for SPT for 1976 of $351,881,000; for 1977, $345,065,000; for 1978, $515,406,000; and for 1979, $457,732,000. (Tr 224-226.)

■ In his direct examination, Doctor Schoenwald was asked as to the weight to be given to the stock and debt approach and to the income approach, respectively, as used by him in his final conclusion of value of the system for each of the years before the court. He answered (Tr 235):

> "* * * [M]y discussion in the text [Pl Ex 1] examines in some detail the relevant merits of the income approach and the stock and debt approach. I conclude that the income approach is, of course, the stronger approach. It could be weighted, in my opinion, as much as 66 percent, or two-thirds, down to one-half, and that the stock and debt approach, which has some problems but at least deals with relevant factors, should be weighted from 33 percent up to 50 percent. I have typically chosen this 50-50 weighting because, due to the tendencies of the computation in the stock and debt approach, there is usually an upward bias indicated by that methodology. * * *"

Doctor Schoenwald's income approach is described in

Plaintiff's Exhibit 1, at 14-43, and summed up in his direct examination (Tr 180-197).

"I used reported net railway operating income as the measure of return to investors on — on his investment. The concept of discretionary income or income that can be extracted from the business is directly consistent with the concept of net railway operating income as used in reporting to the I.C.C." (Tr 180.)

The net railway operating income represents the income to be capitalized after deducting depreciation (which is regarded as the equivalent of capital expenditures) and deducting reported income taxes. (*See* Pl Ex 15.) Plaintiff's Exhibit 1, Appendix A, Table 4, at 73, illustrates the Southern Pacific Transportation Company's system income to be capitalized for the 1979 assessment year. (Similar tables are found for the other years in Pl Ex 1, App B, C and D, Table 4.)[6]

The capitalization rate's determination is set out in detail in Plaintiff's Exhibit 1, at 28-33, and it is applied to the five-year average net income of the five years preceding the assessment year at the following capitalization rates: 1976, 12.57 percent; 1977, 11.90 percent; 1978, 11.63 percent; and 1979, 12.59 percent. (*See* Pl Ex 1, at 34-35.)[7]

Referring to ORS 308.517, which requires that leased property used by a railroad shall be valued as if the lessee had title to the property, Doctor Schoenwald pointed out that this logically required a reduction of federal income tax paid (inasmuch as the rental payments are an income tax deduction) and an addition to a depreciation deduction for the property value represented by the rental. (Tr 190.)

The system values which he determined through the income approach were: 1976, $472,060,000; 1977, $539,429,000; 1978, $554,445,000; and 1979, $495,600,000. (Pl Ex 1, at 15.)

---

[6] It appears that the total federal income tax deduction which, under ICC rules, is attributable to the operating property, has been fully deducted and has not been allocated as required by the Oregon Supreme Court in *Burlington Northern v. Dept. of Rev.*, 291 Or 729, 741 and 754, 635 P2d 347, 354 (1981).

[7] Doctor Schoenwald carefully explained that while it was common to round off factors and multipliers in appraisal work, he had used the exact percentages gained from his calculations (*e.g.*, 12.59) but did not claim that they represented the exactitude in calculation which they appeared to indicate.

Doctor Schoenwald recognized that the stock and debt approach is less reliable than the income approach in this situation (where the parent corporation, Southern Pacific Company, is a conglomerate with many and varied holdings), but he nevertheless determined, in his correlation, to give equal weight to the stock and debt approach and the income approach (e.g., adding the $457,732,000 value found under the stock and debt approach and the $495,600,000, found under the income approach, and dividing the result by two, for a unit value of $476,666,000 for the assessment year 1979, subject to further allocation to determine Oregon's share of the unit value).

Having determined system or unit value for the Southern Pacific Transportation Company, a formula for allocating a proportion of the valuation to the Oregon property is required. Some statutory guidance is given to this problem in ORS 308.550, which allows Oregon to value "the entire property within and without this state as a unit," and then ascertain the property subject to taxation in Oregon by the proportion which the number of miles of rail or operational routes in Oregon, controlled or used by the taxpayer, as owner, lessee "or otherwise" bears to the entire mileage of rail or operational routes controlled or used by the company. However, subsection (2) of ORS 308.550 provides that if the value of the property cannot fairly be determined in the manner prescribed by the foregoing rule, "the department may use any other reasonable method to determine the proper proportion of the entire property assessable for taxation in the state."

The allocation factor used by Doctor Schoenwald was based upon a weighted average of three measures. As stated in his appraisal report, Plaintiff's Exhibit 1, at 63:

"* * * The approach is generally similar to one of the methods of allocating the system or unit value employed by the Oregon Department of Revenue except as noted subsequently.

"The three measures, which appear in Table 8 in each Appendix [App A, B, C and D in Pl Ex 1, at 87, 99, 111 and 123, respectively] are:

"1. Property (weighted at 40 percent in 1979; at calculated weights in prior years)

"2. Line haul (weighted at 45 percent in 1979; at calculated weights in prior years)

"3. Terminal activity (weighted at 15 percent in 1979; at calculated weights in prior years)

"The weights reflect a standard weighting in 1979 which are consistent with and [sic] actual calculations in earlier years, and are similar to the results obtained by the Oregon Department of Revenue under one of its methods. This standardization was necessitated by the elimination of certain data reporting requirements by the Interstate Commerce Commission. Nevertheless, a review of the calculations in the 1976-1978 assessment years (Appendices B to D) supports the reasonableness of this approach."

The allocation factor for each year appears in Plaintiff's Exhibit 1, Appendices A, B, C and D, Table 8, at 87, 99, 111 and 123. The allocation factor to the State of Oregon for the years in issue are: 1976, 9.20 percent; 1977, 9.45 percent; 1978, 9.48 percent; and 1979, 9.20 percent.

Using these multipliers against his system valuation (unit value), Doctor Schoenwald obtained a figure which made no provision for nonunitary property and deduction for exemptions. Accordingly, he added to this figure the nonunitary property, based upon the capitalization of the five-year average of rental income (Pl Ex 1, App A, B, C and D, Table 1), obtaining a State of Oregon value (representing the taxable value in the State of Oregon before the deduction of any appropriate exemptions) as follows: For the 1976 assessment year, $41,529,000; for 1977, $46,179,000; for 1978, $55,569,000; and for 1979, $48,666,000.

Defendant has urgently pressed objections to the plaintiff's correlation and allocation (Def Br, 92-107). Possibly some of these have merit. However, after the Oregon Supreme Court's decision in *Burlington Northern v. Dept. of Rev.*, 291 Or 729, 635 P2d 347 (1981), discussed above, it is plain that the preponderance of the testimony favors the plaintiff's conclusions and the court so finds, with certain modifications.

It is difficult for the court, after hearing testimony over a number of days and after many hours of study of the transcript and exhibits, to weigh the subtleties in the arguments of competent counsel, to undertake to reweave the

fabric developed through complex theories and tables based thereon and to adopt a role of omnipotence in the field of railroad appraisals. Satisfied that the presentation of plaintiff's case is preponderant in representing the viewpoint of the hypothetical willing seller-willing buyer (based as it must be upon approaches to value which are substitutes for bona fide transactions in the marketplace), the court accepts the conclusions of the plaintiff except:

■ (1) In the income approach to value, plaintiff must adjust the federal income tax deduction, reducing it to that portion of the deduction properly allocated to the established unit (system) value;

(2) Plaintiff must adjust the weight accorded the stock and debt approach and the income approach, abandoning the equal weighting used; allowing, instead, a 33 percent weight to the stock and debt approach and a 67 percent weight to the income approach; and

(3) Plaintiff shall utilize the Department of Revenue's adjustment to system values for licensed vehicles (made necessary by Oregon's statute exempting such vehicles from Oregon property tax). (Doctor Schoenwald made no adjustment for this class of property, possibly regarding it as de minimis.)

The court will withhold its decree in order to permit the plaintiff to submit computations pursuant to the court's determination of the issues. The provisions of TC Rule 67 shall be followed. Plaintiff is awarded its costs.