Argued and submitted September 16, 1981, modified April 20, 1982

## PUBLISHERS PAPER CO. et al,
*Appellants,*

*v.*

## DEPARTMENT OF REVENUE,
*Respondent.*

(TC 1183, 1184, 1185, 1186,
SC 27543, 27544, 27545, 27546)

644 P2d 1089

John R. Hay, Portland, argued the cause for appellants. With him on the briefs were Manley B. Strayer, and Stoel, Rives, Boley, Fraser and Wyse, Portland.

Alfred B. Thomas, Salem, argued the cause for respondent. On the brief were Dave Frohnmayer, Attorney General, and Alfred B. Thomas, Assistant Attorney General, Salem.

PETERSON, J.

## PETERSON, J.

In this case we are required to find the fair market value of something which, by itself, is almost never bought and sold and yet is one of the most valuable resources of Oregon. The thing is bare forest land in western Oregon, and there are over five million acres of it. Our responsibility is to determine its true cash value as of January 1, 1977.

Beginning in 1962, the Department of Revenue (herein referred to as "Department") and its predecessor, the State Tax Commission, had the duty to appraise taxable timber and forest land and to determine immediate harvest values in each of the counties west of the summit of the Cascade Mountains. Or Laws 1961, ch 659, codified in ORS 321.605 to ORS 321.680. This system of taxation continued until January 1, 1978. Chapter 892, Oregon Laws 1977, provided for a severance tax in lieu of an ad valorem tax on timber in western Oregon. ORS 321.272. A significant change in the 1977 Act was the establishment of a statutory formula for the assessment of "forest land." ORS 321.377(1) reads as follows:

"Notwithstanding ORS 308.205 [defining 'true cash value'], for the assessment year 1977, forest land in western Oregon shall be assessed at true cash value for forest use on the basis of January 1, 1977, assessed values, established pursuant to ORS 321.622 (1975 Replacement Part)."

Although the 1977 Act removed timber in western Oregon from ad valorem taxation, the ad valorem tax was continued on forest lands in 1977-1978 and for future years, beginning January 1, 1978, based on the values set for January 1, 1977.

ORS 321.352(3) provided that for purposes of determining forest land values, forest land "* * *shall be divided into those market areas as the department shall establish by rule." In OAR 150-321.352(3), the Department divided western Oregon into four marketing areas:

Area 1. Lane County and all counties north of Lane County.
Area 2. Douglas County.
Area 3. Jackson and Josephine Counties

Area 4. Coos and Curry Counties.

The forest land in each of the four areas was assessed according to the soil type of the forest land. The Department of Revenue established eight soil types.[1] Type FA is the best soil type; FX is the worst. Pursuant to ORS 321.352 and ORS 321.377, the Department determined the true cash value of the forest lands in each of the four marketing areas as of January 1, 1977. For illustration and comparison, the table below sets forth the comparison of 1976 and 1977 assessed dollar values in Area 1, per acre, as determined by the Department.

TABLE A

| Soil Class | Jan. 1, 1976 (Value in $ per acre) | Jan. 1, 1977 (Value in $ per acre) |
| --- | --- | --- |
| FA | 124 | 310 |
| FB | 97 | 240 |
| FC | 84 | 210 |
| FD | 67 | 165 |
| FE | 50 | 125 |
| FF | 38 | 95 |
| FG | 27 | 60 |
| FX | 10 | 25 |

A number of owners of forest land in western Oregon, principally corporations and persons involved in raising, harvesting and processing timber, appealed the determination to the Oregon Tax Court pursuant to ORS 321.352(5) by filing a complaint in which they alleged that the true cash values established by the Department of Revenue were excessive and that the January 1, 1977, true cash value of all forest land in Oregon was no more than that established by the Department of Revenue for January 1, 1976.[2]

■ The trial was lengthy. The presentation of testimony began on June 19, 1978, and ended more than three

[1] ORS 321.377(3) provides for categorization of quality by the Department of forest land into base land classes. The Department created eight classes: FA, FB, FC, FD, FE, FF, FG and FX.

[2] ORS 321.352(5) provides that five or more taxpayers "* * * owning in the aggregate not less than five percent of the total forest land acreage subject to taxation in a single land market area may appeal any or all of the values in that area * * *." Appeals were taken in each of the four market areas listed on pages 838-839, and we are required to determine the value of all forest land in western Oregon.

months later, after 34 days of trial. On August 25, 1980, the Tax Court rendered a decision affirming the Department of Revenue determinations. The Tax Court unpublished opinion is 139 pages long and contains a complete summary of the evidence presented by both sides. Our responsibility is to try the case "anew upon the record," ORS 305.445, ORS 19.125(3), *Burlington Northern v. Dept. of Rev.*, 291 Or 729, 733, 635 P2d 347 (1981), to determine the true cash value of the forest land.

## I

## THE DETERMINATION OF THE TRUE CASH VALUE OF OVER FIVE MILLION ACRES OF FOREST LAND IN WESTERN OREGON

ORS 321.257(2) defines "forest land" as "* * * land in western Oregon ("Western Oregon" is defined in ORS 321.257(9) to be roughly all of Oregon west of the summit of the Cascade Mountains) (a) which is being held or used for the predominant purpose of growing and harvesting trees of a marketable species * * * or (b) the highest and best use of which is the growing and harvesting of such trees. * * *" There are over five million acres of forest land in western Oregon. Between 1972 and 1977 there were hundreds of sales involving forest land. Many of the sales involved transactions in which the buyer and the seller were sophisticated and knowledgeable. Most of the sales relied upon by the parties in this case were transactions in which one or both parties to the sale were expert in forest management. Most of the comparable sales involved transactions in which the purchasers were corporations involved in the raising, harvesting, and processing of timber and forest products. Some of the transactions were cash transactions, other sales involved land sale contracts calling for installment payments, and some transfers involved assumptions of pre-existing mortgages by the purchaser.

The selling price of the property usually involved consideration of three main factors—merchantable timber, reproduction and land—but other factors were also significant in some of the sales. The factors which were involved in determining the sales prices included some or all of the following:

1.  Amount, quality and nature of merchantable timber.

2.  Amount, quality and nature of the pre-merchantable timber, normally referred to as "reproduction." (*Compare* ORS 321.605(11) (1975 Replacement Part), which contained a definition of "reproduction.")

3.  Nature of the land itself, which includes the type of soil, topography, and other natural features thereon.

4.  Intangible values, such as access to the property, and location of the property with respect to other property owned by the buyer or seller, or with respect to timber processing facilities.

5.  Existing improvements on the property, including roads and buildings.

6.  Other values in the property, such as the existence of rock or gravel for quarrying and roads.

7.  Whether the sale was an installment sale or involved the assumption of an existing encumbrance.

In most of the transactions relied upon by the parties, the purchasers made a presale measurement of the volume of "merchantable timber." The term "merchantable timber" is loosely defined as forest growth with market value of a size, quality or condition comparable to timber being converted into wood products. *Compare* ORS 321.955(1)(A) (1975 Replacement Part). *See* the definition of "marketable species" now contained in OAR 150-321.358(3)3:

> "Trees of a marketable species refers to those species of trees which are being harvested by cutting, severing or removal for use or sale. Trees of a marketable species will vary from one portion of western Oregon to another and may change in the future as the utilization of forest trees changes. The size, age, location, quality, and condition of trees do not determine marketable species."

The term "merchantable timber" has varying meanings from person to person and from company to company. There was evidence that some timber companies considered a tree to be merchantable if it contained a log 32

feet long with a minimum diameter of six inches. Others used a nine- or 10-inch diameter, breast height standard. Another company "cruised" to a minimum diameter of 12 inches, breast height.

The presale investigations often involved a "timber cruise." One witness described a timber cruise as "a survey of forest land to locate timber and estimate its quantity by species, product size, quality and other characteristics * * *."[3] Timber cruises vary from a "fly over cruise," in which the timber cruiser flies over the area to be "cruised," to a "walk-through" cruise, in which the timber cruiser makes an "ocular estimate" to a timber cruise in which the height, diameter, and other characteristics of each tree are physically measured and recorded.

In many of the sales transactions relied upon by the parties, the volume of merchantable timber was a significant factor in the transaction. In other cases, the volume of merchantable timber was less significant, and the condition and value of the "reproduction" was more significant. The parties also disagreed as to what was included within the term "reproduction" timber, and at what point in its development timber growth became a net asset.

The item of value with which this case is involved and which in most sales was given little independent consideration and rarely segregated as to its separate value either by the parties or in the sales documents was the value of the bare forest land. Of the hundreds of transactions involved in this case, there were no sales of bare forest land. Moreover, there were no sales of reproduction timber, by itself, separate from the land. There were, however, sales of land and reproduction with little or no merchantable timber involved.

---

[3] We adopt the Tax Court definition of a timber cruise:

"* * * In its simplest form, timber cruising leads to an inventory of a forest stand, revealing the quantity and quality of forest products that can be harvested. The cruiser will seek data as to tree quality, site quality, age of stand, species, composition, topographic information, logging possibilities, growth rate of the stand and special-use information. Management plans, logging plans, timber purchases and timber sales are based on cruise data. * * *"

# II
# METHODS USED TO DETERMINE FAIR CASH VALUE

The term "true cash value" is defined in ORS 308.205 as "* * * market value as of the assessment date." OAR 150-308.205-(A)2 provides:

"Real property shall be valued through the market data approach, cost approach and income approach. Any one of the three approaches to value, or all of them, or a combination of approaches, may finally be used by the appraiser in making an estimate of market value, depending upon the circumstances."

All parties purported to use the market data approach. Appraisals were also made using variations of the income approach, a ratio approach, a relative value approach, and others. None of the methods used by the parties involved the market data or income approach as those terms are often used and understood in connection with the appraisal of a specific parcel of real property. *See Burlington Northern v. Dept. of Rev.,* 291 Or 729, 737, 635 P2d 347 (1981); *Bend Millwork v. Dept. of Revenue,* 285 Or 577, 588-589, 591-592, 592 P2d 986 (1979).

The principal method relied on by both the plaintiffs and the defendant was a variation of the market data method, referred to by all parties as the "abstraction approach." One of the plaintiffs' witnesses described the abstraction approach as follows:

"The abstraction appraisal approach for separating bare forest land value from non-merchantable growing stock value is essentially a process of deductive reasoning. If one knows the combined quantity of 'A' + 'B' + 'C' and also the combined quantity of 'B' + 'C', he can identify by abstraction, or subtraction and comparison, the quantity of 'A'.

$$\text{"C} + \text{A} + \text{B} = 100$$
$$\text{"C} + \text{B} \qquad = \ \ 80$$
$$\text{"Then A} \qquad = \ \ 20$$

"The concept and logic is obvious. It is basically mathematical, and is a useful and reliable method of discovering elements of fact that are parts of any whole observation or experience. In the abstraction appraisal however of market transactions, the deductive route to a conclusion is usually

longer and less obvious than in the illustration given above."[4]

The witness continued:

"Abstraction requires the grouping of sales composed of the same elements of value. Elements of value are bare land (L), conifer reproduction (CR), immature conifer (CI), and hardwood (HD). All value elements other than bare land * * * include some type of non-merchantable stocking [reproduction] * * *."

The appraisal methods utilized in this case were complex beyond description, and in some cases, almost beyond comprehension. The plaintiffs' attorney, in his brief, succinctly summarized the task as follows:

"* * * The parties are in agreement that only bare forest land is taxable under ORS 321.377. They also agree that evidence of market value of bare forest land must be derived from other market data because in virtually all sales transactions there is some ground cover enhancing or detracting from the value of the underlying land. Thus, the bare forest land values recognized in each sale transaction can be deduced only as a residual of the selling price after appropriate adjustments for other factors present. The dispute in these cases stems principally from differences as to the determinations of the volumes of merchantable timber to be used in adjusting the sales transactions to arrive at bare forest land values."

The following table sets forth the Department's determination of fair cash value of forest land in western Oregon as of January 1, 1976, January 1, 1977, the appraisal results of Messrs. Alexander and Rickard, the principal witnesses for the plaintiffs, the appraisal results of Mr. Sture, the principal witness for the Department, and the determination made by the Tax Court. As stated above, the Tax Court affirmed, without modification, the Department's determinations of value as of January 1, 1977.

---

[4] The comment that this approach "is usually longer and less obvious than in the illustration given above" is a monumental understatement. The complexity of the appraisal approaches involved in this case rivals description.

| Soil Class | Dept. 1-1-76 ($/Acre) | Dept. 1-1-77 ($/Acre) | Alexander (for plaintiffs) ($/Acre) | Rickard (for plaintiffs) ($/Acre) | Sture (for Dept.) ($/Acre) | Tax Court ($/Acre) |
|---|---|---|---|---|---|---|
| FA | 124 | 310 | 136 | 125 | 357 | 310 |
| FB | 97 | 240 | 114 | 103 | 291 | 240 |
| FC | 84 | 210 | 91 | 81 | 236 | 210 |
| FD | 67 | 165 | 67 | 67 | 188 | 165 |
| FE | 50 | 125 | 46 | 48 | 147 | 125 |
| FF | 38 | 95 | 24 | 20 | 110 | 95 |
| FG | 27 | 60 | -- | -- | 80 | 60 |
| FX | 10 | 25 | -- | -- | 25 | 25 |

TABLE B

## III
## DISCUSSION OF THE STURE APPROACH

The Tax Court was impressed with the testimony of the defendant's principal appraiser, James Sture. We, too, were impressed with the approaches utilized by Mr. Sture, his careful attention to detail, and by the conclusions which he reached, with one exception which will be discussed below.

Sture's approach toward valuing bare forest land was as follows. He first tried to ascertain all sales of forest land in the period 1973 through 1976. He sent questionnaires to the parties to the transactions. The questionnaires were designed to obtain a variety of information, including the location of the property; the number of acres involved; the sales price; whether a mortgage was assumed; the date of the transaction; whether the transaction was "armslength;" whether the parties had "full knowledge of the property involved" by getting an outside appraisal or by consideration of sales of comparable property; what the party considered to be the "principal element of value;" whether the sale involved merchantable timber and reproduction; whether other assets or improvements were involved; and the projected use of the property.

Sture excluded from his analyses a substantial number of the sales transactions. He excluded almost all sales in which merchantable timber represented more than 50 percent of the sales price. He or other persons in the Department of Revenue made a personal inspection of the properties he included in his final analyses and in most

cases, conducted a timber cruise of the merchantable timber, and an analysis of the reproduction.

Although Sture had virtually no previous experience in appraising or in logging, or in the purchase or sale of timber property, his design and approach were systematic, careful and thorough. The Tax Court referred to his presentation as being "well-organized, reasonably reliable," and the court expressly stated that it was impressed by Sture's "* * * candor, conviction and encyclopedic knowledge in his field * * *."

The plaintiffs made a wholesale assault upon Sture's analyses. Their criticisms included these:

1. Sture's timber cruises revealed substantially less merchantable timber than the presale cruises made by a party to the transaction. To put it another way, the plaintiffs complained that Sture substituted his opinion for the value of merchantable timber for the amount believed to be present on the land by a party to the transaction. The plaintiffs argued that Sture unreasonably persisted in his estimates of merchantable timber values when subsequent timber cruises by other Department personnel found substantially more merchantable timber than had Mr. Sture. Plaintiffs presented evidence that in a number of the transactions relied upon by Sture, the merchantable timber physically removed from the property after the sale and prior to trial was substantially greater than the amount Sture assumed was present.

2. Sture's cruise methods were suspect.

3. Sture, after careful efforts to obtain information from parties to the transaction as to the volume and value of merchantable timber, other physical assets on property which figured in the purchase price and other factors which in part determined the purchase price (such as access, location, existing roads, and the like), largely disregarded the information he received. There is evidence that, in some cases, Sture was given actual copies of the timber cruises made by a party to the transaction, and that virtually without exception, Sture relied upon his timber cruises rather than upon the timber cruises made by a party to the transaction.

All parties are agreed that the applicable formula (somewhat simplified for purpose of illustration) is Land (L) + Reproduction (R) + Merchantable Timber (MT) = Value (V).

In short, what this case involves is an effort to isolate the value factor L in transactions which normally involved factors L, R, and MT, when factor L was generally the least important factor involved, which normally was not bought or sold separately, and as to which the parties in many cases had established no separate value. One witness observed that the "actual occurrence of a sale of forest land that is absolutely devoid of vegetation in its entirety is extremely rare." In fact, such sales are virtually non-existent. None of the transactions involved in this case involved the sale of forest land which was truly "bare."

If the value of R or MT is overstated, the result understates the value of the residual land. Conversely, if the value of R or MT is understated, the result overstates the value of the residual land. In a nutshell, the plaintiffs' principal criticism of Sture's approach was that his systematic understatement of the value of the merchantable timber resulted in a systematic overstatement of value of the residual land.

■       Under the evidence in this case, using mass appraisals, we find that the abstraction approach is appropriate. The Sture formulas and approaches strike us as being generally objective and fairly reliable. But we question his systematic disregard of the parties' (usually the buyer's) beliefs as to the volume and value of merchantable timber on the property.

OAR 150-308.205-(A)1.a defines "market value" as follows:

> "Market Value as a basis for true cash value shall be taken to mean the highest price in terms of money which a property will bring if exposed for sale in the open market, allowing a period of time typical for the particular type of property involved and under conditions where both parties to the transaction are under no undue compulsion to sell or buy and are able, willing, and *reasonably well-informed*." (Emphasis added.)

Sture believed that the Department cruises were the best evidence of the amount of merchantable timber and/or reproduction actually on the property at the time of the sale. The Department contends that, to the extent that the cruises of a party differed from the amount of merchantable timber and/or reproduction physically present on the property, the parties may not have been "reasonably well-informed." In its brief the Department argues:

"* * * [T]he appraiser 'must formulate his own judgment as to the qualities present on the subject property' which would be known or knowable to able parties reasonably well informed. On the other hand, plaintiffs * * * state that the appraiser must accept the buyer's claimed valuation allocations for the sale. The plaintiffs would permit the appraiser to disregard a value allocation to an element which the appraiser decided did not belong. Surely the appraiser ought to make his own determination of the market value allocation of the elements in the sale necessary to a residual land value analysis."

The Department's contention fails to consider that the sales prices agreed upon were reached following arms-length transactions between parties who, for the most part, were knowledgeable in such matters. More importantly, the Department's contention and Sture's analyses inadequately consider that the sales were made at a price which must have been determined, to some degree, by the parties' opinions as to the volume and value of the timber involved in the sale. The seller may have believed that the value of the merchantable timber was $X$. The buyer may have believed or assumed that the value of the merchantable timber was $Y$. In either event, the sales price was largely or partially determined by the parties' belief as to the value of the merchantable timber thereon. The transactions were closed on that basis. That a subsequent cruise determines that the value of merchantable timber was $Z$ does not necessarily mean that both the seller and buyer were mistaken or were not "reasonably well-informed" or that the transaction be disregarded.

Sture's approach was to utilize the sales *price* agreed upon by the parties, but largely to disregard their conclusions as to the value of the merchantable timber or reproduction thereon, and to disregard entirely their

opinions as to the value of the land itself. His approach has an appeal of sorts, for in a sense, it is based upon a thorough investigation of the facts, particularly as it involves the value of merchantable timber and reproduction physically present thereon. But the approach also has a defect—a defect which inheres in the approach so substantially that the approach must be recast to give greater consideration to the beliefs of the parties to the transaction. We draw on an example from the Department's brief. The Department quotes from page 147 of The Appraisal of Real Estate, 7th ed, as follows:

"In this use of the allocation procedure, comparable land sales data is abstracted from sales of similar improved properties. From the total sale price of a comparable property, the portion that could reasonably be assigned as building value is estimated and deducted. The remainder, except for intangibles, must be the land. For example, a 10,000-square foot garage sold for $120,000. The appraiser estimates the depreciated cost of such a garage at $9 per square foot, or $90,000. The remainder of $30,000 may indicate a residual price of the land, assuming that the garage building represents typical or highest and best land use and that no intangible considerations were involved in the transaction. The portion of the sale price allocated to land is then treated as if it were the price obtained in an actual sale of vacant land.

"Although perhaps applicable where there are no sales of vacant land or even where vacant land does not exist, the result of this procedure may not be conclusive and collateral confirmation may be needed."

Assume the example to which reference was made in the quoted paragraph above. Land and a building believed to have 10,000 square feet sells for $120,000. The appraiser estimates the depreciated cost of the building at $9 per square foot, or $90,000, leaving a value of the land at $30,000.

Sture's approach is to accept the sales price, $120,000, but to remeasure the building himself, and base his determination of the value of the building not upon the square footage believed to be present by one or both parties, but to base his decision as to the square footage which he found. Thus, if he were to find that the square footage of

the building was 9,000 feet rather than 10,000 feet, his appraisal would have this result:

| | |
|---|---|
| Sales price | $120,000 |
| Less value of the building | |
| (9,000 square foot @ $9 | 81,000 |
| Residual value of land | $ 39,000 |

The vice of this approach is that it assumes that the parties to the transaction would have entered into the contract and completed the sale at the price agreed upon had they known that the building had 9,000 square feet.

■ To a degree, Sture's approach incorporates hindsight. Moreover, Sture's approach tends to exclude the assumption that the parties were reasonably well informed for his result turns upon his evaluation of the quantity of two of the three principal components of the transaction rather than upon the quantity the parties believed was involved. At bottom, his approach necessarily assumes that had the parties to the sale believed that the merchantable timber and/or reproduction were in the amount Sture found and not as found by their prepurchase cruises, the sale would nonetheless have been concluded at the same sales price. We believe that if the understanding of the parties as to the value or amount of merchantable timber and reproduction present had been as found by Sture, the sale prices likely would have reflected that fact, resulting in most cases in a lower overall sales price. In isolating the value of the bare land, it is probable that in most of the transactions considered, the contemporary understanding of the parties as to the six factors listed above determined the price paid for the property. Therefore, in attempting to abstract the value of the land, some consideration has to be given to the values put on the various factors by the parties to the transactions.[5]

---

[5] We are not to be understood as suggesting that in appraising a given property the appraiser should not personally view the property and make an appropriate investigation, which may include actual physical measurements. There is abundant evidence that in a mass appraisal involving hundreds of properties, when the appraised asset is something which is rarely bought or sold by itself, if the abstraction method is followed, it is appropriate to consider what the parties believed was involved in the sale, particularly when the appraiser's independent measurements differ, in a substantial way, from those made by the parties to the transactions. That is one of our findings in this opinion.

The evidence shows, without much question, that almost all of the transactions relied upon by all parties involved sales in which one or both parties were involved in the forest products business. In a mass appraisal, such as is involved herein, where the parties to arms-length sales transactions are generally knowledgeable and sophisticated as to the value of the type of asset involved, the sales price, as agreed upon by the parties, has some relation to the fair market value of the asset sold. To illustrate: If the entire five million plus acres of forest land (including reproduction and merchantable timber) in Oregon changed hands in 1976, in cash transactions between knowledgeable buyers and sellers, and the total consideration paid were $5,000,000,000, we would have little hesitancy in concluding that the fair market value of the forest land (including reproduction and merchantable timber) was $5,000,000,000. The determination of the value of the residual bare land should be made, insofar as it is possible to do so, by what one or both parties believed the value of the constituent parts—the merchantable timber, the reproduction, and the other tangible or intangible items values—to be. Sture's conclusions represent *his* view of what the participants should have perceived, rather than what the participants actually perceived.

One of the reasons Sture limited his comparable sales to transactions in which industrial forest firms were the purchasers was to limit his consideration to sales by perceptive parties. In a mass appraisal such as we have in this case, to the extent that any party was ill-informed in any individual transaction, considering the number and entirety of the transactions, it is probable that the effect on the overall result would be minimal.

The Tax Court, on page 116 of its opinion, observed, "After 34 days of testimony, it is regrettable that a truly satisfactory method of determining the true cash value of bare forest land remains an enigma. * * *" Judge Roberts continued (Tax Court opinion at 120), "The testimony is clear that the means of determining bare forest land for purposes of taxation are difficult, unreliable and even obscure." He concluded (pages 122-123 of the Tax Court opinion):

"The work of a state's chief revenue agency should be, and regularly is, entitled to great respect. The legislature has provided in ORS 305.427 (applicable in these suits), that the burden of proof shall fall upon the party (or parties) seeking affirmative relief from the determination of the governmental agency. * * *

"* * * * *.

"The preponderance of the evidence supports the defendant; the plaintiffs have not sustained the burden of proof. The bare forest land values established by the Department of Revenue as of January 1, 1977, under the provisions of ORS 321.257 to 321.372 are affirmed. * * *"

We are in full agreement with the Tax Court that the method of valuing the bare forest land is vexedly difficult. Every approach to valuation of this amount of property is subject to some criticism. Logical and persuasive arguments can be made to support the appropriateness of different methods and the correctness of different conclusions. But there must be an end somewhere, and certainty, in itself, has some attraction.

We share the Tax Court's opinion that Sture made a thoughtful, careful plan, and carried it out in a diligent manner. But an important assumption—to base his conclusions upon his estimates of the value of the merchantable timber and the reproduction thereon, to the virtually complete exclusion of the parties' opinions of the value of the merchantable timber and reproduction—consistently skewed the value of the merchantable timber, resulting in an understatement of the value of the merchantable timber and a resulting overstatement of the value of the bare land.

■ After the case was argued and taken under advisement we reached a tentative conclusion that we preferred Sture's approach toward the problem over that of the other witnesses, except for his systematic exclusion of the parties' (usually the buyer's) prepurchase measurements or opinions as to the value and volume of the merchantable timber thereon. We believed that the record was sufficiently complete to make calculations using the Sture approach but giving greater weight to the buyer's prepurchase appraisals. There was evidence concerning prepurchase cruises made by the purchaser of the property, cruises made by the

buyer with a view to determine the value of the timber growth (both merchantable timber and reproduction) thereon, *and without this case in mind.* The parties had stipulated as follows:

> "That if representatives of the respective purchasers * * * were called as witnesses, each would testify that the purchaser he represents reached prepurchase appraisal value conclusions * * * as set forth in * * * attached lists. * * *"

We therefore submitted this question to the parties:

> "The parties have stipulated that 'if representatives of the respective purchasers identified in the attached lists were called as witnesses, each would testify that the purchaser he represents reached prepurchase appraisal value conclusions '* * * as set forth in such attached lists.' What would be the result if Mr. Sture's analyses were repeated, using the procedures followed in Exhibits YYY (Abstraction) and ZZZ (Ratio), but using the purchasers' prepurchase estimates of merchantable timber, as contained in the stipulation, instead of the estimate of merchantable timber Mr. Sture used in preparing Exhibits YYY, ZZZ and VVV?"

The parties thereafter filed supplemental briefs which included detailed, extensive appendices which contained their analyses and the results thereof. The results of their calculations are set forth below:

TABLE C

| Soil Class | Plaintiffs (Value in $ per acre) | Department's (Value in $ per acre)[6] |
|---|---|---|
| FA | 124 | 219 |
| FB | 97 | 177 |
| FC | 84 | 147 |
| FD | 67 | 120 |
| FE | 50 | 94 |
| FF | 38 | 62 |
| FG | ? | 21 |
| FX | ? | ? |

We believed our question to be clear: The submissions were to be based upon a repetition of Mr. Sture's

---

[6] The Department also made an analysis in which its conclusions were higher than those contained in Table C.

analyses, using the prepurchase appraisal value conclusions contained in the stipulation. We had expected that the results of the resubmissions would be very much alike. But, as seen above, the results were almost as disparate as the original submissions of the parties. We therefore studied the resubmissions to ascertain why the conclusions were so variant.

The defendant's calculations were made by Mr. Sture. His conclusions as to the residual value of the land and reproduction were generally higher than those reached by the plaintiffs. There were two main reasons for this. One was that Sture consistently excluded all sales where the residual values of the land and reproduction were zero or less than zero. For example, in sale 34A-6, the prepurchase appraisal of merchantable timber was $38,237. The purchaser was able to obtain the land and timber for $28,500, which obviously is substantially less than the value of the merchantable timber, to say nothing of the reproduction and land. Sture excluded that sale and sales 2A-8 and 21A-27 from his calculations.

Also, where there was no stipulation of the parties concerning prepurchase appraisal value conclusions, Sture used his cruise figures to the complete exclusion of testimony concerning those purchases. For example, in sale 22A-19 the sales price was $291,000. Sture's estimate of the value of the merchantable timber on the property was $80,309. After making an adjustment for the trended increase in value by the passage of time he concluded that the land and reproduction was worth $218,034. There was testimony that the prepurchase cruise estimate of merchantable timber exceeded $390,000.

The plaintiffs, on the other hand, where there was no stipulation as to the prepurchase appraisal value conclusions, generally used the figures given by one of the plaintiffs' witnesses in the witness's testimony. Again referring to sale 22A-19, the plaintiffs used an estimate of the merchantable timber of $390,761, which was substantially more than the price paid for the property by the purchaser. The result, as to this one sale, sale 22A-19, was a plaintiffs' estimate of the value of merchantable timber and reproduction of zero, and a total difference between the plaintiff's

and Sture's, as to the value of the residual timber and reproduction of $218,034. The sales in which the plaintiffs relied upon the testimony of witnesses in the absence of a stipulation concerning prepurchase appraisal values included sales 5A-13, 21A-14, 20A-35, 22A-19, 21A, 22A-20, and 21A-13. Sales in which Sture relied upon his cruise figures in the absence of a prepurchase appraisal included all of those listed above in the previous sentence, and sales 22A-10, 20A-29, 20A-57, and 20A-58.

In addition, the submissions of both parties contained minor errors, either in arithmetic or otherwise. There was also some variance in the results, depending upon the place in the equation where the time factor was included in the calculations.

The effect of the plaintiffs' systematic use of their witnesses' testimony in the absence of any prepurchase appraisal value conclusions in the stipulation tended to resolve all conflict in the testimony in favor of the plaintiffs. We are also mindful of the fact that, by asking the parties to submit further calculations based upon the stipulation, such calculations tend to favor the plaintiffs to the exclusion of Sture's postpurchase appraisal value conclusions as to the volume and value of merchantable timber on the properties.

The immediate result of Sture's exclusion of all sales having negative reproduction and land residual values was to exclude from any consideration those sales which were the most favorable to the plaintiffs. To a lesser degree, his reliance upon his cruise conclusions to the total exclusion of the other testimony in the record resolved all factual disputes in his favor. Even so, after consideration of the entire record and the parties' supplemental submissions, we find that the values contained in Sture's supplemental submission fairly state the fair cash value of Oregon forest land. We find that the fair cash value of the forest land in Area 1 is as follows:

TABLE D

| Soil Class | Defendants (Value in $ per acre) |
|---|---|
| FA | 219 |
| FB | 177 |
| FC | 147 |
| FD | 120 |
| FE | 94 |
| FF | 62 |
| FG | 27 |
| FX | 20[7] |

The Department, in its supplemental brief, states that "* * *[i]f the court should modify the Tax Court's findings it is possible to spread the land value so adopted for each market area to all zones. * * *" The defendant suggests that the same percentage adjustments, if any, could be made to the other market areas. Sture's pretrial analyses of the other market areas utilized a different method, the ratio method. His pretrial analyses of Area 1 included an abstraction approach and a ratio approach, with results which, although not identical, were comparable. We have therefore decided to accept the Department's suggestion and make similar adjustments to the values in Areas 2, 3, and 4. We file with this decision tables that set forth our determinations as to the true cash value of all forest land in western Oregon as of January 1, 1977. In making the adjustments, we reduced all of the Department's January 1, 1977, valuations by the same percentage. For example, the Department's January 1, 1977, value for FA land in Area 1 was $310. Our determination was $219. Two hundred nineteen dollars is 70.645 percent of $310. We reduced all of the Department's January 1, 1977, values proportionately. The factors used were as follows:

| FA | 219 divided by 310 | = | .70645 |
|---|---|---|---|
| FB | 177 divided by 240 | = | .7375 |
| FC | 147 divided by 210 | = | .7 |
| FD | 120 divided by 165 | = | .72727 |
| FE | 94 divided by 125 | = | .752 |
| FF | 62 divided by 95 | = | .65263 |
| FG | 27 divided by 60 | = | .45 |

[7] Sture's supplemental submission listed a value of $21 per acre for FG land. The prayer of the plaintiff's complaint asked that the court determine that the base land values be taxed and assessed "* * * at values which do not exceed * * *" the 1976 values. We use the 1976 values for FG land and establish the value of FX land at $20 per acre.

One issue remains for decision: Are the taxpayers liable for interest on the increased taxes? We turn to a discussion of that question.

## TAXPAYERS' LIABILITY FOR INTEREST ON THE INCREASED TAXES

The Tax Court's decree provided that:

"(2) * * * The current 1977-1978 assessment rolls shall * * * be corrected for each account by the county assessor by adding to such roll the difference between the foregoing computations of forest land value and the forest land value of each account as shown on the uncorrected 1977-1978 roll. The resulting additional forest land value for each individual account shall be certified to the county's tax collector for the calculation of an recording of unpaid property tax thereon.

"(3) The tax collector shall proceed forthwith to notify the several taxpayers and to collect such unpaid taxes, *together with interest thereon accrued from November 15, 1977,* as provided by ORS 311.505(2) and 311.545." (Emphasis added.)

The plaintiffs claim that the statutes do not require the payment of any interest on any increased taxes resulting from this appeal unless the tax is not paid by the 16th of the month following the month the tax roll is corrected. ORS 311.205; ORS 311.206.

ORS 311.205 provides, in part, as follows:

"(1) After the assessment and tax roll is returned to the assessor from the county board of equalization, if the officer having charge of the roll discovers an error or omission in the roll, he may correct the roll to conform to the facts, as follows:

"(a) He may correct a clerical error * * *."

"(b) He may not correct an error in valuation judgment. Such errors are those where the assessor would arrive at a different opinion of value after the roll has been returned to him by the board.

"(c) He may correct any other error or omission of any kind, so long as it is not a change in his valuation judgment. Such errors include, but are not limited to, the elimination of an assessment to one taxpayer of property belonging to another on the assessment date, *the correction of a value changed on appeal,* or the correction of an erroneous amount certified as the levy of a taxing district.

"* * * * *." (Emphasis added.)

ORS 311.206 concerns the payment of interest after a tax roll is corrected under ORS 311.205. It provides:

"Whenever the roll is corrected under ORS 311.205, and taxes are added to the roll or taxes already on the roll are increased, the additional taxes becoming due shall be payable without interest, if paid in the period prior to the 16th of the month next following the month of the correction. If not paid within such period, the additional taxes shall thereafter be considered for all purposes of collection and enforcement of payment as having become delinquent on the date they would normally have become delinquent if timely extended on the roll or rolls in the year or years for which the correction was made."

■ ORS 311.205 is the general statute governing the correction of errors and omissions to the tax roll, including correction of values changed on appeal, after the roll is returned to the assessor from the Board of Equalization. One example of an instance where taxes could be increased as the result of an appeal is where a county assessor successfully appeals an order by the Board of Equalization reducing an assessed property valuation. ORS 305.275(2). Another example would be where a taxpayer appeals a decision of the Board of Equalization and the property value is further increased on the appeal. In the usual case, if a taxpayer appeals an assessed property valuation, the taxpayer is taxed on the assessed valuation pending the outcome of the appeal. An exception to this general rule, however, is made in cases where "the dollar difference between the total value asserted by the taxpayer and the total value asserted by the opposing party exceeds one-fourth of one percent (.0025) of the total assessed value in the county." In such cases, the assessor enters on the roll "only that portion of the total value which is not in controversy for tax purposes of computing and extending the tax upon the tax roll." ORS 308.020.

A different procedure applies in appeals under ORS 308.020. In such cases the tax roll is corrected and interest on any additional taxes is collected, not under ORS 311.205 and ORS 311.206, but pursuant to ORS 311.160, which provides, in relevant part:

"(1) Where a final order is entered in any appeal described in ORS 308.020, the officer or officers in

possession of the assessment and tax rolls shall make the corrections stated in the order of the Department of Revenue, the decision of the Oregon Tax Court or the decision of the Supreme Court, whichever is applicable. Any additional taxes collected because the final total value is greater than that entered in the rolls under ORS 308.020 shall be deposited in a special account with the county treasurer. * * *

"(2)   Interest shall accrue on the additional taxes collected pursuant to subsection (1) of this section as if the property had been properly assessed in the year that any portion of the value was placed on the tax roll in the manner and at the interest rates provided in ORS 311.505.

"(3)   If the owner of the property, the value of which is subject to ORS 308.020, so desires, the owner may tender to the county treasurer an estimate of the additional taxes which may ultimately be assessed against the property. The county treasurer shall provide a special account for such deposits and shall invest the deposits during the time the matter is in litigation. The interest earned on the account shall be credited to it.

"(4)   Upon the termination of the controversy, the principal amount in the account necessary to pay the taxes as provided in subsection (1) of this section shall be retained together with its portion of the interest earned on the investment of the moneys during the period held by the county treasurer and shall be distributed as provided in subsection (1) of this section. Moneys in the account in excess of that required to be retained shall be refunded to the owner. * * *

"* * * * * *."

ORS 308.020 and ORS 311.160 do not directly apply to this appeal. However, the legislature has provided similar procedures for appeals of 1977 forest land values in ORS 321.352(7) and chapter 497, Oregon Laws 1979 (hereafter chapter 497).[8] ORS 321.352(7) provides:

"(7)   If an appeal is made to the tax court under this section, and the decision of the court is not rendered on or before the next September 1, the higher of (a) the value asserted by the representative group or (b) the comparable

---

[8] Chapter 497 has a "SECTION 1" and a "SECTION 2." "SECTION 1" has five subparts, numbered (1) through (5). In this opinion, when we refer to a "section" of chapter 497, we are referring to one of the five subsections of SECTION 1. For example, if we refer to "section (2) of chapter 497," we mean subsection (2) of SECTION 1, *not* SECTION 2 of chapter 497.

value used in arriving at the true cash value of forest land on the assessment and tax rolls for the prior tax year shall be used in computing the true cash value of those forest land values that are based on the value under appeal."

ORS 321.352(7) is similar to ORS 308.020 in that, during the pendency of the appeal, the property is not taxed at the assessed valuation and the taxpayer pays taxes only on the amount not in controversy. Chapter 497 appears to be based upon ORS 311.160. Its provisions parallel the provisions of ORS 311.160, with one significant omission, which will be discussed below. Chapter 497, in relevant part, provides:

"Sec. 1. (1) If a final order is entered in any appeal by reason of which the value of forest land in western Oregon was entered on the assessment and tax roll for the assessment year 1977, or any assessment year thereafter, under ORS 321.277(2)(b), 321.622(6) (1975 Replacement Part), as amended by chapter 753, Oregon Laws 1977, or ORS 321.352(7), the officer or officers in possession of the assessment and tax rolls shall make the corrections stated in the order of the Department of Revenue, the decision of the Oregon Tax Court or the decision of the Supreme Court, whichever is applicable. *Any additional taxes and interest attributable thereto,* collected because the value of the forest land is greater than that entered in the rolls under ORS 321.277(2)(b), 321.622(6) (1975 Replacement Part), as amended by chapter 753, Oregon Laws 1977, or ORS 321.352(7) for the assessment year shall be deposited with the county treasurer to be held in special accounts pursuant to this subsection * * *.

"* * * * *.

"(4) If the owner of the forest land, the value of which was determined under ORS 321.377(2)(b), 321.622(6) (1975 Replacement Part), as amended by chapter 753, Oregon Laws 1977, or ORS 321.352(7), so desires, the owner may tender to the county treasurer an estimate of the additional taxes which may ultimately be assessed against the forest land. The county treasurer shall provide a special account for such deposits and shall invest the deposits during the time the matter is in litigation. The interest earned on the account shall be credited to it.

"(5) Upon the termination of the controversy, the principal amount in the account necessary to pay the taxes, *and interest on such taxes,* as finally ordered, shall be

retained together with the portion of the interest earned on the investment of the retained taxes during the period held by the county treasurer and shall be distributed as provided in subsections (1) to (3) of this section. Moneys in the account in excess of that required to be retained shall be refunded to the owner. * * *"[9] (Emphasis added.)

The significant omission, the omission which the plaintiffs assert is fatal to the Department's claim that the legislature intended that interest be accrued from 1977 under chapter 497, is the omission of a similar or identical counterpart to ORS 311.160(2). There is no disputing that chapter 497 has no counterpart to ORS 311.160(2). Upon examination of chapter 497 and comparison of the two statutes, however, we are not convinced that the omission excludes interest.

One purpose of ORS 311.160(3) and section (4) of chapter 497 is to permit a taxpayer to avoid the payment of interest otherwise payable by tendering an estimate of the taxes which may ultimately be assessed against the property, should the taxpayer lose the case. The legislative history of chapter 497 indicates that section (4) of chapter 497 was included, at least in part, for that purpose. Our study of the legislative history has disclosed no explanation for the legislature's failure to include an express counterpart to ORS 311.160(2). However, avoidance of accrued interest as an incentive to a taxpayer to prepay estimated additional taxes that might be imposed as a result of the litigation was discussed by both legislative committees considering the measure. Section 4 was also discussed as a means of preventing a taxpayer from claiming, after the conclusion of the appeal, that no interest was payable on any additional taxes assessed as a result of the appeal. House Revenue Committee, April 30, 1979; Senate Revenue and School Finance Committee, June 18, 1979. Also, section (5) of chapter 497 provides that "upon the termination of the controversy, the principal amount in the account necessary to pay the taxes, *and interest on such taxes* as finally ordered, shall be retained." (Emphasis added.)

---

[9] The omitted provisions of the two statutes (ORS 311.160 and chapter 497) also closely parallel each other. They are primarily concerned with the offset and apportionment of the additional taxes collected against the levies of the various local taxing districts.

■       The second sentence of section (1) of chapter 497 makes specific reference to interest. It begins with the words, "Any additional taxes *and interest attributable thereto,* collected because the value of the forest land is greater than that entered in the rolls * * *." (Emphasis added.) Its counterpart in ORS 311.160, the second sentence of ORS 311.160(1), does not refer to the payment of interest. That sentence begins, "Any additional taxes collected because the final total value is greater than that entered in the rolls * * *." The inclusion of the words *"and interest attributable thereto"* in the second sentence of section (1) of chapter 497 indicates that the legislature intended that interest would be payable if "* * * the value of the forest land is greater than that entered in the rolls * * *." This conclusion is strengthened by the fact that there is no apparent reason for treating the taxpayers in this case differently from taxpayers whose appeals are covered by ORS 311.160. Apart from the fact that this is a type of "class action" appeal, one in which all of the taxpayers whose rights are at risk are not parties, there would seem to be no other real difference between the types of appeal. We find nothing in chapter 497, to convince us that the legislature intended otherwise. The general provisions of ORS 311.206 are not applicable to this case, but must give way to the specific provisions of chapter 497, Oregon Laws 1979, which we conclude require the payment of interest on the deficiency accrued from November 15, 1977.

## CONCLUSION

The decree of the Tax Court is modified as follows. The January 1, 1977, true cash value for forest use of forest land in each western Oregon county is determined to be the amount set forth on the schedules filed in this court with this opinion (consisting of six pages which list the true cash values of forest land for each western Oregon county).[10] Except as so modified, the decree of the Tax Court is, in all respects, affirmed.

Costs to neither party.

---

[10] We see no need to append the schedules to this opinion.